Filed 1/8/14 (reposted 1/10/14 to correct filing date)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JEREMY L. MILLBROOK,<br><br>        Defendant and Appellant. | A134382<br><br>(Alameda County<br>Super. Ct. No. H49349) |

Jeremy L. Millbrook shot and gravely injured Sione Manoa, a fellow guest at a house party, during a heated exchange. In addition to injuring Manoa, the bullet struck the hand of Matthew Galvan, a friend of Manoa who was trying to prevent the argument from escalating into a physical fight. A jury convicted Millbrook of one count of attempted murder of Manoa, one count of assault with a firearm on Manoa, and one count of assault with a firearm on Galvan.[1] It also found true various enhancements that are not directly at issue in this appeal.[2] The jury was unable, however, to reach a verdict on an

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.C., D., and E.

[1] Millbrook was convicted under Penal Code sections 187, subdivision (a), 664, subdivision (a) (attempted murder), and 245, subdivision (a)(2) (assault with a firearm). Unless otherwise noted, all further statutory references are to the Penal Code.

[2] In connection with the attempted murder conviction, the jury found true the enhancement allegations of intentional discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d)) and infliction of great bodily injury (§ 12022.7, subd. (a)). In connection with the assault convictions, the jury found true the enhancement allegations of use of a firearm (§ 12022.5, subd. (a)) and infliction of great bodily injury (§ 12022.7, subd. (a)).

allegation that the attempted murder was willful, deliberate, and premeditated (§ 664, subd. (a)), and the trial court accordingly dismissed it.

The trial court sentenced Millbrook to a total term of 35 years and four months to life. This sentence included a term of seven years for the attempted murder, a consecutive term of 25 years to life because a firearm was used in the attempt, and a term of three years and four months for the assault on Galvan and related enhancements. The court stayed the sentences for the conviction of assault on Manoa and its related enhancements and for the infliction of great bodily injury enhancement related to the attempted murder conviction. Millbrook timely appealed.

On appeal, Millbrook argues that (1) the jury should have been instructed on attempted voluntary manslaughter based on a sudden quarrel or heat of passion; (2) insufficient evidence supported his conviction for attempted murder; (3) testimony about a prior uncharged act was improperly admitted into evidence; (4) a juror should have been dismissed after he submitted a note questioning defense counsel's tactics; and (5) the cumulative effect of these errors amounted to a denial of due process.

In the published portion of this opinion, we conclude that Millbrook's conviction for attempted murder cannot be sustained because the jury was not instructed on attempted voluntary manslaughter based on a sudden quarrel or heat of passion, and we conclude that this error was prejudicial. The People may retry Millbrook for attempted murder, however, because we also conclude that there was sufficient evidence presented to support the charge. If the People elect not to retry Millbrook, we direct that the judgment be modified to reflect a conviction for attempted voluntary manslaughter.[3] We reject Millbrook's remaining claims and otherwise affirm.

---

[3] If the judgment is modified to reflect a conviction for attempted voluntary manslaughter, the enhancement allegation of infliction of great bodily injury under section 12022.7, subdivision (a) will stand because that statute also applies to attempted voluntary manslaughter. However, the enhancement allegation of intentional discharge of a firearm causing great bodily injury will not stand because section 12022.53, subdivision (d) does not apply to that crime.

# I.
## FACTS

At trial, witnesses gave varying accounts of the shooting and the events leading up to it. We begin by discussing some of the uncontroverted facts.

*A.     The Party.*

Fernanda Placencia invited guests to her San Leandro home for a party on December 19, 2009, to celebrate her birthday. About 40 people attended the party, the majority of whom were her coworkers at a Target store in Hayward.

Manoa, who was 20 years old, and Galvan were friends of Placencia who had security jobs at Target. At the time, Manoa was approximately five feet 10 inches tall, weighed approximately 235 pounds, and played football for his junior college. Because the men worked in security, Placencia had asked them to make sure that the party went smoothly and that everyone followed the rules. Galvan did not interpret this as a serious request for special assistance, however, and assumed he and Manoa were going to the party to have fun like everyone else.

Manoa and Galvan arrived at Placencia's house between 10 and 10:30 p.m. At first, the two men were in the garage, where most of the Target employees had gathered. Six to ten of Placencia's other friends, who were unknown to Manoa and Galvan, were on the house's back porch. The two groups were not interacting, but everyone was having fun, and the party was going well.

Manoa testified that he rarely drank alcohol, and he recalled having only two beers at the party. He could not remember preparing or drinking any mixed drinks. Galvan, however, testified that over the course of the night, he and Manoa each drank three to four beers and one mixed drink, which Manoa prepared. Manoa acknowledged he was intoxicated at the party, but he testified that the alcohol did not change his mood, and he was calm for most of the night. Galvan agreed that Manoa did not seem to be unduly intoxicated, although in his statement to the police after the shooting Galvan said that Manoa had been "drinking heavily."

3

Meanwhile, Millbrook had also arrived at Placencia's residence with his girlfriend, Jennifer Diaz, a close friend of Placencia. Millbrook was 18 years old and attended community college. At the time, he weighed 160 to 165 pounds and was "very" thin. He parked his car, a Porsche Cayenne, in the driveway, and he remained with Diaz in the car for a while. He testified that he was reluctant to go into the party, and he implied this was because a group of men with whom he had an ongoing conflict often hung out near Placencia's house. Susan Cesena, one of Diaz's friends, joined Millbrook and Diaz while they were in the parked car, and the three smoked marijuana. Cesena corroborated Millbrook's testimony that he was reluctant to attend the party. She gave a shot of alcohol to Millbrook, but he testified that he did not drink it. Eventually, the women convinced Millbrook to go to the party, and the three went into the garage to dance.

Millbrook brought a gun into Placencia's party and kept it in his waistband. He testified that he brought the gun because he did not know who would be at the party, and he was scared and wanted to protect himself should any threats arise. After dancing in the garage, Millbrook sat on the back porch and smoked more marijuana.[4]

Placencia did not want the partygoers to go into the house other than to use the bathroom. Nevertheless, a group of five or six men—including Cesar Leyva (Cesar), who was dating Placencia and worked at Target, and Cesar's brother, Adrian Leyva (Adrian)—congregated in the house around the dining-room table. Manoa and Galvan went inside to talk to Cesar and joined this group.

Placencia had too much to drink and became sick. For a while, she was in the bathroom. Some of her nonwork friends, including Diaz and Cesena, eventually helped her to her bedroom.

---

[4] Millbrook, who admitted to "fairly regularly" smoking marijuana, estimated that on a scale of one to ten, his level of intoxication when he shot Manoa was about a five. Millbrook did not believe that the marijuana he smoked was a "major factor" in the shooting. In an "abundance of caution," the trial court instructed the jury on voluntary intoxication as it affected the charge of attempted murder.

4

A man who had been on the back porch approached the group gathered around the dining-room table and told them that they should not be in the house. The man left after Cesar told him that everything was fine, and a woman told him that Placencia knew Cesar and that it was all right for the group to be inside. Manoa and Galvan then went into the kitchen.

B.    *Manoa Argues with Diaz.*

Diaz went to the kitchen after leaving Placencia's bedroom, and she and Manoa began to argue. Four witnesses testified about the argument: Manoa, Galvan, Cesar, and Adrian.[5] They generally agreed that Manoa and Diaz began swearing and yelling at each other and got increasingly angry and loud. According to Manoa, Diaz approached him and Galvan and told them, "Everybody needs to get the fuck out of the house." Manoa testified that he felt defensive and upset because he did not think she had a right to tell him to leave. He could not recall everything he said to Diaz, but he did remember saying, "Fuck you, bitch. Don't talk to me like that. I'm not going anywhere."

Manoa and Cesar testified that Manoa and Diaz were standing apart from each other during the argument. Galvan, however, testified that Manoa and Diaz "started off . . . a couple of feet from each other but ultimately they were in each other's face[s.]" In Galvan's statement to the police, he characterized Manoa as being "belligerent" during this argument and throughout the night. Galvan believed that the argument was serious enough that he needed to intervene. He escorted Diaz outside to the back porch while another Target coworker tried to calm Manoa. Galvan returned to the kitchen and spoke to Manoa, who had an "intense" presence and was "breathing hard" but seemed to be calming down. Cesar estimated that the argument between Manoa and Diaz lasted about a minute.

C.    *Manoa Argues with Bianca Velez.*

According to Manoa, about five to ten minutes after his argument with Diaz, another friend of Placencia, a woman later identified as Bianca Velez, entered the kitchen

---

[5] Diaz did not testify at trial, and Millbrook did not mention this incident in his testimony.

and asked him why he had spoken to Diaz that way. She seemed upset that Manoa had cursed at Diaz and had called her names, and she told him he needed to leave. Manoa got into an argument with Velez, although Manoa testified that it was not as intense as his argument with Diaz. Galvan did not remember an argument between Manoa and Velez but testified that it could have happened.

Millbrook testified that he was inside the house waiting to use the bathroom while Manoa and Velez were arguing, and he described the argument as "very intense." He was concerned that the argument would escalate because Manoa was "very aggressive." Millbrook had "never seen anyone so angry . . . in such a little space, [and] it seemed like [Manoa] was larger than life." Millbrook testified that Diaz was trying to stop the fight, and she eventually escorted Velez outside.

Millbrook claimed that he thought Manoa was dangerous because of his earlier observation of Manoa while Millbrook and Diaz were still on the porch. Millbrook testified that he saw Manoa, who was standing in the driveway, clutch his waistband and say loudly into his phone, "I got my thing. I got my thing," which Millbrook interpreted to mean that he had a gun. Manoa denied making any phone calls during the party or saying "I got my th[i]ng."

Cesena testified that while she was in the bedroom helping Placencia she heard Velez arguing with a man, presumably Manoa, whom Velez had asked to leave. According to Cesena, the man stated, in apparent references to Placencia and Velez, "[W]ake that ho up . . . wake her up. She needs to kick this bitch out." Cesena testified that the man and his group of friends "weren't being peaceful" and that she had previously heard him arguing and seen him exhibiting "obnoxious behavior . . . all over the house." She and her friends wanted the group of men to leave because no one was supposed to be in the house and Placencia was too intoxicated to control the party. According to Cesena, the men "didn't want to leave the house" and "essentially were the cause of everything." She never saw Millbrook fight with anyone.

Cesena testified that after overhearing the argument involving Velez, she went outside to try to end the party before somebody became violent. She remembered Velez

6

being on the back porch and "telling the guys" that the other group did not want to leave the house.

At this point, accounts of what happened diverge significantly.

D.    *Manoa Argues with Millbrook.*

Manoa testified that while he and Velez were arguing, Galvan suggested to Manoa that they leave the party, and Manoa agreed. They began walking toward the door when Millbrook entered the kitchen from the back porch with a few male friends. Manoa remembered that Diaz also had returned to the kitchen and was standing near Millbrook. Millbrook then asked Manoa, whom he had not previously met, "Why the fuck you talk to my girl like that?" Millbrook was "being a boyfriend trying to figure out what was going on." Manoa testified that he explained that Diaz had yelled at him, and they had started arguing. Manoa and Millbrook started arguing and swearing at each other, becoming increasingly upset, and Diaz also started yelling. Manoa did not remember Millbrook saying he had a gun or otherwise threatening him.

Galvan testified that when Millbrook and his friends entered the kitchen, they were calm. He testified that the situation escalated, however, when no one answered Millbrook's repeated questions about what had happened, and Manoa said, "Hey, this is none of your business." Eventually, Galvan thought the argument had reached a point "that there was not going to be a way to de-escalate" it, and he determined he needed "to separate the two parties" or else they would start physically fighting. Galvan was facing Manoa with his back to Millbrook, and he had his hand on Manoa's chest as he tried to break up the argument and to get Manoa to leave the party. Galvan recalled that Manoa's "shoulders were real tense," and "he had his arms at his side, and they were balled up in fists" throughout the argument. Manoa's facial expression was "upset and angry." Galvan also testified that Manoa "was trying to stick his head around" Galvan, who is six feet four inches tall, so Manoa could still see Millbrook and "continue to argue with him."

According to Millbrook, after Diaz took Velez outside, he was in the kitchen with several people he did not know, including Manoa and Galvan. Manoa was still angry

7

from the fight with Velez, and Manoa's friends were "closing in" to find out what had happened. Millbrook testified that he felt "surrounded." Describing his mental state, he said, "[I]t's a small area. Everybody was against me. Everybody was [Manoa's] friend. No one's going to stick up for me. No one's going to take my side."

Millbrook testified that he asked Galvan what was wrong. Even though Millbrook had not addressed Manoa, Manoa responded by saying, "I don't know who the fuck he is. Shut the fuck up. Don't worry about it, and get the fuck out of here." According to Millbrook, Galvan told him that he should leave Manoa alone and that he did not want to mess with Manoa. Millbrook recalled that he became "humble" and "real quiet," afraid because he thought Manoa had a gun based on his earlier behavior. He also explained that he did not try to leave the house at this point because he would have had to walk by Manoa and because he was waiting for Diaz to shut down the party.

Millbrook testified that Diaz came back into the kitchen and also asked what had happened. He characterized her as being "very calm," but Manoa was "still in a rage" and told her, "Shut the fuck up, bitch. This ain't none of your business." According to Millbrook, he was angry that Manoa had called Diaz a "bitch," and he felt that he needed to defend her. Millbrook tried to get Diaz to stop arguing with Manoa, pulling her toward him.

Millbrook testified that when Manoa did not calm down he began cursing at Manoa, and the men exchanged words. Millbrook remembered telling Manoa, "Fuck you. You need to get out. This is where the party is being shut down." He remembered Manoa responding, apparently referring to Placencia, "I run this shit. This is my fucking house. I run this shit. Tell that bitch to wake up. Tell that bitch to come out. She needs to take care of me." Manoa was moving toward Millbrook, "reaching, long steps, hands in the air, gestures" and trying to get around Galvan as Galvan held him back. Other people were closing in around Millbrook, laughing and yelling. Millbrook testified that he was scared.

In explaining his fear in the moments before the shooting, as well as his reluctance to attend the party in the first place, Millbrook described at length his history of being

threatened by a contemporary of his, Michael Pina, and several others, known collectively as "the Gun Boys," whom he often ran into in and around his hometown of San Lorenzo. Little evidence was presented to contradict Millbrook's testimony about being threatened by Pina and the Gun Boys.

Millbrook testified that he and Pina attended San Lorenzo High School together. One day, Pina and three others jumped Millbrook at school and, after that, the conflict escalated. Millbrook described one occasion in July 2008 when he was stopped at a light while driving and Pina, Bernardo Sandoval, and several others drove by, turned around, and pulled up next to him. He thought they were going to carjack him, and he sped away. The next day, Millbrook was driving and passed the same car, which was traveling in the opposite direction. The car made a U-turn and stopped in front of Millbrook's car, blocking it. Sandoval got out of the car, approached Millbrook, and pulled out a gun. Millbrook "hit the gas" and got on the freeway. When he got home, Millbrook noticed that the driver's side door of his car had a bullet hole in it, and he realized Sandoval had shot at him. Millbrook reported the incident to the police, but his problems with Pina and the Gun Boys continued.

A detective with the Alameda County Sheriff's Office testified and confirmed that Millbrook reported the incident. The detective observed and photographed the bullet hole in Millbrook's car. The detective then searched Sandoval's house, found two Uzis and multiple other weapons, and arrested him. Sandoval was eventually prosecuted for shooting at Millbrook.

Millbrook testified that he transferred to a different school and sought counseling as a result of his problems with Pina and his friends. He stopped going out and socializing as much, and he changed his driving routes because he was afraid to run into the Gun Boys. Due to the "constant[] . . . harass[ment]" from the group, he also felt he had to get a gun to protect himself.

According to Millbrook, his confrontation with Manoa in Placencia's kitchen brought to mind being victimized by Pina and his friends because of the people surrounding him, the high tension, and the yelling and shouting.

9

*E.    The Shooting.*

The prosecution's witnesses who testified about the shooting were Manoa, Galvan, Cesar, Adrian, and Sonia Gonzalez, another one of Placencia's coworkers. Their accounts varied in some respects, but they uniformly contradicted Millbrook's testimony that Manoa had a gun.

Manoa testified that very quickly after he began arguing with Millbrook, he saw Millbrook's friends move out of the way. Millbrook "lunged" toward Manoa with his arm fully extended and shot him from about two feet away. Manoa denied saying or doing "anything threatening" before Millbrook shot him. He also could not remember having threatened Diaz. He testified that he had never possessed or shot a gun in his life, and he repeatedly denied having had a gun that night or having made any movement with his hand to indicate he had a gun before he was shot.

Galvan, who had his back to Millbrook, testified that, within 20 to 25 seconds after the argument started, he saw Manoa take a step backward. Manoa then brought his hands up to his face, "as if he was going to try to deflect a punch." Galvan pivoted to get out of the way because he thought a punch was being thrown. He felt a "concussive force" near his face, heard a sound like a balloon popping, and felt something hit his hand, which was still close to Manoa's chest. He did not remember Manoa or Millbrook threatening the other, and he did not remember Manoa reaching for his waistband or saying he had a gun.

Cesar testified that he was surprised when he saw Millbrook pull out a gun and shoot Manoa because he did not think the argument had gone that far. He did not see Manoa move as if reaching for a gun.

Adrian testified that he saw Millbrook trying to calm Diaz. According to Adrian, Manoa told Millbrook, "You better check your bitch," meaning that he should quiet Diaz. Manoa testified that he could not remember saying this to Millbrook, although it was possible he had. Adrian recalled that Millbrook responded that Manoa should not talk to his girlfriend like that. Millbrook then reached for his gun, cocked it, and pointed his arm straight out and fired the gun toward Manoa. As was Cesar, Adrian was surprised when

10

the gun came out because he did not believe that Manoa and Millbrook were on the verge of a physical fight. Adrian never saw Manoa with a gun and never heard him say anything to indicate he had one. He also never saw Millbrook "lunge" with the gun or move toward Manoa, and he did not hear Millbrook threaten to kill Manoa.

Gonzalez testified that she heard Manoa say to Diaz, "Shut up, I'm going to get somebody to beat your bitch-ass up." According to Gonzalez, Millbrook then pulled out his gun, pointed it with his arm straight out, and fired it. She did not remember seeing Millbrook cock the gun or lunge at Manoa, and she did not remember Millbrook saying anything before firing. She was also surprised when she saw the gun, because it was "[j]ust a regular argument." She did not see Manoa make any aggressive movements or indicate that he had a gun. She did not remember whether Manoa had clenched fists.

Millbrook was the only defense witness to testify about the shooting.[6] He testified that Manoa was about 10 to 12 feet away from him. About 15 to 25 seconds after the argument started, Millbrook focused on Manoa's hands and saw him "start[ing] to clench one fist and essentially grasp something with the other." Although Millbrook could not see Manoa well because Galvan was in the way, it looked to Millbrook as if Manoa was grabbing a gun and preparing to shoot him or Diaz, who was slightly behind Millbrook. Millbrook testified that he saw Manoa pull out a gun and Galvan step to the side. Millbrook then saw Manoa point a nickel-plated, "fairly big" semiautomatic under Galvan's shoulder with his arm fully extended.

Millbrook testified that he became scared, and he panicked. He felt "a rush of anxiety and adrenaline" and pulled out his gun. He claimed that as he pulled out his gun from his waistband the slide caught in his pants, cocking the gun. He testified that he instinctively raised the gun, intentionally aimed it at Manoa, closed his eyes, and purposely shot it once. He opened his eyes and saw Manoa falling backward, still holding a gun. According to Millbrook, he did not cock or shoot his gun again.

---

[6] Cesena, the only other defense witness who attended the party, did not see the shooting.

Millbrook testified that as he was pulling out the gun, he was "trying to stop" Manoa. "I was not trying to feel what [getting shot] felt like. I was not trying to be a victim again." He testified, however, that it was not his intent to kill Manoa. Millbrook testified that he loved Diaz and did not like it when other people treated her disrespectfully, but he denied shooting Manoa because he called Diaz a "bitch" or because he did not show her respect.

F.      *The Aftermath.*

After the gunshot, everyone in the room "scatter[ed]" out of the kitchen. Manoa and Galvan ran out the back door. A friend of Manoa took him to the hospital. Galvan drove himself to the hospital.

Millbrook ran out the front of the house to his car. As he and Diaz were getting in the car, Diaz yelled, "Why did you do that?" Cesar also ran outside and saw a Porsche Cayenne drive out of Placencia's driveway, hitting another car on the way.

The police recovered one cartridge case from a fired bullet and one unfired bullet and cartridge case in Placencia's kitchen. Based on information from Diaz, they also recovered a gun, bullets, and a magazine from a roadside in Castro Valley. There is no indication in the record that a gun matching Millbrook's description of Manoa's weapon was ever recovered.

A ballistics expert testified that if a live bullet was in the chamber of a gun like Millbrook's and the slide was pulled back, the bullet would eject without firing. If the gun was fired, a cartridge case would fall out and another bullet would be chambered. In the former case, it would require "a certain amount of force" to pull back the slide in order for a chambered round to fall out, although the expert could not tell whether Millbrook's gun had any malfunctions that might make accidental cocking easier. Thus, the evidence recovered from Placencia's kitchen and the ballistics expert's testimony tended to suggest that Millbrook's gun had a bullet in the chamber when he pulled it out, that it was unlikely that the slide went back accidentally when the gun was pulled out, and that Millbrook shot only one bullet.

12

Manoa was shot in the chest, and the bullet lodged in his spine. He was in an induced coma for almost a week and stayed in the hospital four weeks after that, losing about 50 pounds.

The bullet hit Galvan on the middle knuckle of his right hand and traveled through it, shattering the joint. He wore a cast for several weeks, and he was able to recover most of his range of motion after going through physical therapy.

Millbrook and Diaz drove straight to Reno, where Millbrook was soon apprehended. He admitted that he and Diaz disposed of the gun on their way to Reno and that he lied to the police after his arrest by telling them that he was never at Placencia's party.

## II.
### DISCUSSION

A. *Millbrook's Conviction for Attempted Murder Cannot Be Sustained Because the Jury Was Not Instructed on Attempted Voluntary Manslaughter Upon a Sudden Quarrel or Heat of Passion.*

At trial, Millbrook's defense centered on his theory that he had shot Manoa in self-defense. The jury was properly instructed that Millbrook was not guilty of attempted murder if he acted reasonably in self-defense and that he was alternatively guilty of the lesser included offense of attempted voluntary manslaughter if he acted unreasonably in self-defense (imperfect self-defense). (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) But Millbrook did not ask for, and the trial court did not on its own initiative give, an instruction that he was guilty of attempted voluntary manslaughter if he acted "upon a sudden quarrel or heat of passion" (a heat-of-passion instruction). (§ 192, subd. (a).) On appeal, he argues that his conviction for attempted murder must be reversed because the jury was not instructed on this form of attempted voluntary manslaughter. We agree.[7]

---

[7] Because we conclude that the trial court had a duty to give a heat-of-passion instruction, we do not consider Millbrook's alternative argument that his attorney's failure to request such an instruction constituted ineffective assistance of counsel.

13

1.     The elements of attempted murder and attempted voluntary manslaughter are well-established.

We begin by reviewing the elements of attempted murder and attempted voluntary manslaughter. "Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) Thus, " '[a]ttempted murder requires the specific intent to kill and the commission of a direct act toward accomplishing the intended killing.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.)

When a person attempts to kill while acting upon a sudden quarrel or in the heat of passion—even if exercising a sufficient "measure of thought . . . to form . . . an intent to kill"—he or she acts with "a mental state that precludes the formation of malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).) A person acts upon a sudden quarrel or in the heat of passion if his or her reason " ' "was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation or reflection, and from such passion rather than from judgment." ' " (*Ibid.*) Thus, the offense of attempted murder is reduced to the lesser included offense of attempted voluntary manslaughter when the defendant acted upon a sudden quarrel or in the heat of passion. (*People v. Williams* (1988) 199 Cal.App.3d 469, 475; accord *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708-709.)

2.     The trial court had a duty under California law to give sua sponte a heat-of-passion instruction.

Trial courts have the duty under California law "to instruct fully on all lesser necessarily included offenses supported by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149 (*Breverman*).) "[I]n a murder prosecution," a court's duty to instruct sua sponte "includes the obligation to instruct on every supportable theory of the lesser included offense of voluntary manslaughter, not merely the theory or theories which have the strongest evidentiary support, or on which the defendant has openly relied." (*Id.* at p. 149; see *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 833-834

14

[applying this principle to prosecution for attempted murder].) We review de novo a trial court's failure to instruct on a lesser included offense (*People v. Waidla* (2000) 22 Cal.4th 690, 733), and in doing so we view the evidence in the light most favorable to the defendant. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, fn. 5.)

For the duty to instruct on a lesser included offense to arise, there must be " 'substantial evidence' [citations], ' "which, if accepted . . ., would absolve [the] defendant from guilt of the greater offense" [citation] but not the lesser.' " (*People v. Waidla*, *supra*, 22 Cal.4th at p. 733.) Evidence is substantial if "a reasonable jury could find [it] persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8 (*Barton*).) "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*Breverman*, *supra*, 19 Cal.4th at p. 162.) "[S]ubstantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself" (*id.* at pp. 162-163) and "even when as a matter of trial tactics a defendant . . . fails to request the instruction."[8] (*Id.* at p. 154; see also *Barton,* at pp. 196, 203 [a "jury's truth-ascertainment function" is impaired unless "the opportunity to decide whether the defendant is guilty of a lesser included offense established by the evidence" is given, and " '[t]he jury should not be constrained by the fact that the prosecution and defense have chosen to focus on certain theories' "].) In particular, even if the defendant testifies to a mind state inconsistent with the theory of a lesser included offense, substantial evidence may still support an instruction on that offense. (*Breverman,* at p. 163, fn. 10.)

Turning to the case before us, we first observe that there is nothing in the jury's verdict that is inconsistent with the need for a heat-of-passion instruction. If the jury had returned a verdict on the allegation that Millbrook's attempted murder of Manoa was

---

[8] If, as a matter of tactics, a "defendant *persuades* a trial court not to instruct on a lesser included offense supported by the evidence . . ., the doctrine of invited error bars the defendant from challenging on appeal the trial court's failure to give the instruction." (*Barton*, *supra*, 12 Cal.4th at p. 198, italics added.) This doctrine is inapplicable here because there is no indication in the record that Millbrook objected to a heat-of-passion instruction being given.

15

willful, premeditated, and deliberate, the finding would have been "manifestly inconsistent with having acted under the heat of passion." (*People v. Wharton* (1991) 53 Cal.3d 522, 572.) But the jury was unable to return such a verdict. And although the jury must have found that Millbrook intended to kill since such a finding is a prerequisite for a conviction of attempted murder, the finding does not rule out the possibility that Millbrook acted upon a sudden quarrel or in the heat of passion. (See *Beltran*, *supra*, 56 Cal.4th at p. 942.) This possibility was similarly not ruled out by the jury's rejection of the two self-defense theories upon which it was instructed—that Millbrook was not guilty of attempted murder because he acted in reasonable self-defense and, in the alternative, that Millbrook was guilty only of attempted voluntary manslaughter because he acted in imperfect self-defense. Indeed, " '[i]n the usual case,' " a heat-of-passion instruction " 'supplements the self-defense instruction.' " (*People v. St. Martin* (1970) 1 Cal.3d 524, 531; see, e.g., *Breverman*, *supra*, 19 Cal.4th at pp. 148, 162-164 [error not to give heat-of-passion instruction where jury instructed on both theories of self-defense]; *Barton*, *supra*, 12 Cal.4th at pp. 202-203 [sufficient evidence supported giving both heat-of-passion and imperfect-self-defense instructions].)

We recognize that a heat-of-passion instruction is not always warranted "where the same facts" supporting it "would give rise to a finding of reasonable self-defense." (*People v. Wickersham* (1982) 32 Cal.3d 307, 327-328.) But this is not such a case. Millbrook's testimony that Manoa pulled out a gun and that he thought Manoa was going to shoot him would have supported a finding of self-defense. Even if the jury did not believe that Millbrook shot in self-defense, however, it still could have concluded that he shot in the heat of passion arising from Manoa's treatment of him or Diaz or from a fear that did not rise to the level of fear required to establish self-defense. (See *People v. Mitchell* (1939) 14 Cal.2d 237, 252-253 ["[h]eat of passion may be produced by fear as well as by rage," and "[p]rovocation sufficient to produce a heat of passion . . . may, under slightly varied circumstances, justify a person in killing in self-defense"].)

16

Having concluded that nothing in the jury's verdict is inconsistent with the need for a heat-of-passion instruction,[9] we next consider whether there was substantial evidence, viewed in the light most favorable to Millbrook, to support such an instruction. We conclude there was.

Attempted manslaughter based on a sudden quarrel or heat of passion has both a subjective and an objective component (see *People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*)), and we consider each in turn. To satisfy the subjective component, the defendant must have attempted to kill "while under 'the *actual* influence of a strong passion' induced by [adequate] provocation." (*Id.* at p. 550, italics added.) As a result, "[i]f sufficient time has elapsed for one's passions to 'cool off' and for judgment to be restored," malice is not negated. (*Beltran*, *supra*, 56 Cal.4th at p. 951.) "No specific type of provocation is required, and 'the passion aroused need not be anger or rage, but can be any " ' "[v]iolent, intense, high-wrought or enthusiastic emotion" ' " [citations] other than revenge.' " (*People v. Lasko* (2000) 23 Cal.4th 101, 108.)

Millbrook testified that when he shot Manoa he was "scared" and "panicking" and "was not trying to be a victim again." By rejecting the two forms of self-defense upon which it was instructed, the jury concluded that Millbrook did not have an actual fear that he was in imminent danger of death or great bodily injury. (See *People v. Humphrey*, *supra*, 13 Cal.4th at p. 1082.) But substantial evidence was presented upon which the jury could nonetheless have found that Millbrook was acting under the actual influence of extreme emotion. This evidence included testimony that Manoa had acted belligerently throughout the party and had engaged in intense arguments with Diaz and Velez; testimony that Manoa was the one who escalated the fight with Millbrook; testimony that Manoa, who was much bigger than Millbrook, had clenched his fists and "lunged" at Millbrook before being shot; testimony that Galvan intervened in the argument and had his hand on Manoa to prevent a physical altercation; testimony that Manoa had

_____

[9] Our later conclusion that Millbrook's conviction for attempted murder is supported by sufficient evidence does not render harmless the failure to give a heat-of-passion instruction. (*Breverman*, *supra*, 19 Cal.4th at p. 178, fn. 25.)

17

threatened to get someone to beat Diaz and told Millbrook to "check your bitch" immediately before the shooting; testimony that Millbrook was angered by Manoa's treatment of Diaz; and testimony that Millbrook had been threatened in violent incidents in the past and was intimidated by Manoa's size and by being surrounded by Manoa's friends. Although Millbrook denied shooting Manoa because Manoa disrespected Diaz, the jury was entitled to disbelieve Millbrook's *reason* for shooting and to rely on the other evidence we have identified to find that Millbrook shot spontaneously and under the influence of extreme emotion. (*Breverman*, *supra*, 19 Cal.4th at p. 163, fn. 10; see, e.g., *People v. Logan* (1917) 175 Cal. 45, 46-47, 50 [defendant entitled to heat-of-passion instruction where evidence demonstrated victim's "physical superiority" and defendant's "fear that he was about to be subjected to a second humiliating beating" at victim's hands]; *People v. Anderson* (2006) 141 Cal.App.4th 430, 443, 446-447 [evidence that "fatal chokehold was motivated by rage at the victim's unprovoked attack" sufficient to require heat-of-passion instruction].)

There was also substantial evidence presented to support the objective component of heat of passion. To satisfy this component, " ' "the accused's heat of passion must be due to 'sufficient provocation.' " ' " (*Moye*, *supra*, 47 Cal.4th at p. 549.) The victim must cause the provocation or the defendant must reasonably believe that the victim caused it. (*Id.* at pp. 549-550.) "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Id.* at p. 550; see also *Beltran*, *supra*, 56 Cal.4th at p. 949 ["the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection," original italics].) As our Supreme Court recently clarified, in determining whether the conduct was adequately provocative, the question is whether it would cause an ordinary person of average disposition "to react from passion and not from judgment," *not* whether it "would cause an ordinary person of average disposition *to kill*" (or attempt to kill). (*Beltran,* at pp. 938-939, original italics.)

18

"Generally, it is a question of fact for the jury whether the circumstances were sufficient to arouse the passions of the ordinarily reasonable person." (*People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1705; see also *Beltran*, *supra*, 56 Cal.4th at pp. 950-951.) While it is true that a court may decide the issue of adequate provocation if "the provocation is so slight . . . that reasonable jurors could not differ on the issue of adequacy" (*Fenenbock,* at p. 1705), the provocation shown here is not so slight that we can conclude, as a matter of law, that a reasonable jury would have been unable to find that Millbrook acted upon a sudden quarrel or in the heat of passion.

The jury could have found adequate provocation in several ways. To begin with, the jury could have found it based on the evidence presented of Manoa's treatment of Diaz. Several witnesses testified that Diaz and Manoa had a serious argument, which Millbrook likely knew about. In addition, two witnesses testified that Manoa said something insulting about or to Diaz immediately before being shot: "You better check your bitch," according to Adrian, and "Shut up, I'm going to get somebody to beat your bitch-ass up," according to Gonzalez.

The jury also could have found adequate provocation based on Manoa's other belligerent and threatening behavior. As mentioned above, this evidence included testimony that Manoa had been aggressive throughout the night, including engaging in shouting matches with Velez in addition to Diaz; testimony that Manoa was the one who escalated the fight with Millbrook; testimony that Manoa had his hands clenched and "lunged" at Millbrook immediately before being shot; and testimony that Galvan intervened right before the shooting with his hand on Manoa to prevent an escalation of the argument. In short, evidence of Manoa's treatment of Diaz and of Manoa's menacing behavior was sufficient to permit a jury to conclude that a reasonable person in Millbrook's position could have acted in the heat of passion.

Decisions in cases with similar facts support our conclusion that sufficient evidence of provocation was presented. In *Barton*, the defendant was convicted of voluntary manslaughter and argued on appeal that the trial court erred by giving a heat-of-passion instruction over his objection. (*Barton*, *supra*, 12 Cal.4th at pp. 190, 201.)

19

Our Supreme Court disagreed, concluding that "[t]he record contain[ed] substantial evidence, some of it offered by the prosecution and some by the defense," to support a heat-of-passion instruction. (*Id.* at p. 202.) That evidence showed that shortly before the defendant shot the victim, the defendant's daughter had told him that the victim tried to run her car off the road and had spat on her car window. (*Ibid.*) The defendant and his daughter then confronted the victim, at which point the victim called the daughter a " 'bitch' " and acted " 'berserk.' " (*Ibid.*) The defendant and the victim then confronted each other, with the victim assuming a " 'fighting stance.' " (*Ibid.*) After the defendant asked his daughter to call the police, the victim tried to leave in his car and the defendant asked him where he was going. (*Ibid.*) The victim "replied, 'none of your fucking business,' and taunted [the] defendant by saying, 'Do you think you can keep me here?' " (*Ibid.*) The defendant began "[s]creaming and swearing" and threatened to shoot if the victim did not drop his knife (although the evidence conflicted as to whether the victim actually had one). (*Ibid.*) Thus, as here, testimony was presented that a person close to the defendant was threatened or disrespected, the defendant and the victim argued, and the defendant felt threatened when he shot the victim.

In a recent decision from this district also involving a fight that led to a shooting, our colleagues in Division Three reversed a conviction for second degree murder because the jury was not given a heat-of-passion instruction. (*People v. Thomas* (2013) 218 Cal.App.4th 630, 633, review den. Oct. 30, 2013, S213262) (*Thomas*).) In *Thomas*, the defendant engaged in a " 'pretty heated' " argument with the victim and the victim's friends after the defendant blocked in the friends' car. (*Id.* at pp. 634-635, 645.) Witnesses agreed that at least one of the victim's friends punched and beat the defendant. (*Id.* at pp. 635, 639, 645.) Testimony was presented that the defendant then went to his car and retrieved a gun, that the defendant seemed angry, and that the defendant's father tried to calm him. (*Id.* at p. 645.) According to the defendant, the victim then approached and "lunged at him," making the defendant believe the victim was trying to get the defendant's gun. (*Ibid.*) The defendant testified that "[h]e fired because he was afraid, nervous and not thinking clearly." (*Ibid.*)

20

As in our case, prosecution and defense witnesses in *Thomas* agreed that a sudden quarrel preceded the shooting, and evidence was presented that the defendant felt both angered and threatened by the victim. But in our case it was the victim himself who was belligerent and threatening rather than the victim's friends. And whereas the defendant in *Thomas, supra,* 218 Cal.App.4th 630 had some time to " 'cool off' " while retrieving his gun and speaking with his father (see *Beltran*, *supra*, 56 Cal.4th at p. 951), Millbrook shot Manoa in the midst of their argument. Thus, the evidence of provocation in the case before us is more compelling than it was in *Thomas*.

The circumstances here—Manoa's disrespectful treatment of Diaz, the sudden quarrel between him and Millbrook, and Manoa's threatening behavior before and during the argument—also distinguish our case from decisions holding that insults alone are insufficient to constitute adequate provocation. (See, e.g., *People v. Enraca* (2012) 53 Cal.4th 735, 743-744, 759 [gang-related insults]; *People v. Avila* (2009) 46 Cal.4th 680, 706 [same]; *People v. Manriquez* (2005) 37 Cal.4th 547, 585-586 [victim repeatedly called defendant a " 'mother fucker' " and taunted him to use his weapon]; *People v. Lucas* (1997) 55 Cal.App.4th 721, 739-740 [smirking, taunting, and name-calling]; but see *People v. McCowan* (1986) 182 Cal.App.3d 1, 15 [heat-of-passion instruction required where defendant confessed that "he became enraged" when his ex-wife "made an obscene gesture at him" as he drove by her home, prompting him to shoot her].) While our conclusion that a jury could have found adequate provocation might be different if Manoa had merely cursed or insulted Millbrook, various witnesses' testimony about Manoa's statements to and about Diaz and his threatening behavior throughout the night and immediately before the shooting were sufficient under California law to require the trial court to give a heat-of-passion instruction sua sponte.

3.   Whether trial courts ever have a duty under the federal
     Constitution to give sua sponte a heat-of-passion instruction
     in a noncapital case is unresolved.

Millbrook contends that the failure to instruct the jury on the heat-of-passion form of attempted voluntary manslaughter violated his federal constitutional rights. He argues

that, as a result, the federal constitutional standard for assessing prejudice applies, requiring reversal unless it appears beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) This federal standard contrasts with the less-stringent standard for assessing prejudice from a state constitutional error, which requires reversal only if there is a reasonable probability that the error contributed to the verdict. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

Whether the federal standard applies in assessing prejudice when a trial court fails to give sua sponte a heat-of-passion instruction in a noncapital murder case is unresolved. Although we ultimately conclude that Millbrook was prejudiced under the state standard, we take a moment to consider the federal constitutional issues because the case authority on this important question is inconclusive and because, as we discuss below, our Supreme Court in *Thomas* explicitly directed the Court of Appeal to consider the federal constitutional issues. (*People v. Thomas* (Aug. 29, 2012, S203557).)

We begin with *Breverman.* In that case, our Supreme Court applied the *Watson* standard (46 Cal.2d 818) to assess the trial court's failure to give sua sponte a heat-of-passion instruction in a noncapital case. (*Breverman*, *supra*, 19 Cal.4th at pp. 148-149, 165.) In broad language, the court "reject[ed] any implication that the alleged error at issue in this case—the failure to instruct sua sponte on an uncharged lesser included offense, or any aspect thereof—is one which arises under the United States Constitution." (*Id.* at p. 165.) It observed that "the United States Supreme Court has expressly refrained from recognizing a federal constitutional right to instructions on lesser included offenses in noncapital cases" in two cases in which the defendants had requested such instructions. (*Id.* at pp. 165-166 & fn. 14.) Our Supreme Court explained that in one of those cases, *Beck v. Alabama* (1980) 447 U.S. 625 (*Beck*), the United States Supreme Court "acknowledged that in particular circumstances, the denial of instructions on lesser included offenses *in a capital case* would violate the federal Constitution." (*Breverman, supra,* 19 Cal.4th at p. 166, original italics.) But our Supreme Court pointed out that subsequent decisions limited *Beck* and "suggest[ed the United States Supreme Court's]

reluctance to formulate any general constitutional right to instructions on lesser offenses." (*Breverman,* at p. 166.) Our Supreme Court concluded that "the high court's decisions leave substantial doubt that the federal Constitution confers *any* right to lesser included offense instructions in noncapital cases" and "provide no basis whatever for a conclusion that the federal charter would require such instructions, as does California, *on the court's own motion.*"[10] (*Id.* at p. 168, original italics.) Accordingly, the *Breverman* court "affirm[ed] that the rule requiring sua sponte instructions on all lesser necessarily included offenses supported by the evidence derives exclusively from California law." (*Id.* at pp. 168-169.)

This discussion would seem to have resolved the question whether a failure to give sua sponte a heat-of-passion instruction implicates the federal Constitution. But another portion of *Breverman* makes clear that it did not. In a footnote, the court expressly declined to decide whether such a failure to instruct could constitute a federal constitutional error on the theory that it presented to the jury an incomplete definition of malice, which is an element of the charge of murder, and thus relieved the prosecution's burden of proving all elements of an offense beyond a reasonable doubt. (*Breverman*, *supra*, 19 Cal.4th at p. 170, fn. 19 [observing that "[t]he issues presented by such a claim must properly await a case in which they have been clearly raised and fully briefed"]; *id.* at pp. 189-190, dis. opn. of Kennard, J. [arguing that the instructional error violated the federal Constitution for this reason].) Our Supreme Court has subsequently reaffirmed that this issue remains open. (See *Moye*, *supra*, 47 Cal.4th at p. 558, fn. 5 [declining to decide the issue because the defendant had not properly preserved the claim of federal constitutional error]; see also *People v. Lasko*, *supra*, 23 Cal.4th at p. 113 [explaining that

---

[10] *Beck* explicitly declined to determine "whether the Due Process Clause would require the giving of such instructions [on lesser included offenses] in a noncapital case." (*Beck*, *supra*, 447 U.S. at p. 638, fn. 14.) The circuits have split on whether to extend *Beck* to noncapital cases. (*Solis v. Garcia* (9th Cir. 2000) 219 F.3d 922, 928-929 [listing cases].)

23

*Breverman* "declined to consider whether [the] error violated the federal Constitution by giving the jury an incomplete definition of malice"].)[11]

In *Thomas*, the Court of Appeal ultimately concluded in a published opinion that a trial court's failure to give a requested heat-of-passion instruction in a noncapital case amounted to a federal constitutional error subject to review under *Chapman, supra,* 386 U.S. 18. (*Thomas*, *supra*, 218 Cal.App.4th at pp. 642-644.) In doing so, the court relied on *Mullaney v. Wilbur* (1975) 421 U.S. 684, 704 (*Mullaney*), in which the United States Supreme Court held that federal due process "requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." Justice Kennard also relied on *Mullaney* in her dissent in *Breverman.* (*Breverman*, *supra*, 19 Cal.4th at p. 190, dis. opn. of Kennard, J.)

The procedural history of *Thomas*, both before and after the Court of Appeal reached its ultimate conclusion that *Chapman, supra,* 386 U.S. 18 applies, reinforces the uncertainty whether a failure to give a heat-of-passion instruction implicates the federal Constitution. When the defendant in *Thomas* first appealed, the Court of Appeal affirmed his conviction of second degree murder by relying on *Breverman* and concluding in a nonpublished opinion that the trial court's failure to give a requested heat-of-passion instruction was harmless under *Watson, supra,* 46 Cal.2d 818. (*Thomas, supra,* 218 Cal.App.4th at p. 633; *People v. Thomas* (May 16, 2012, A129933) [nonpub. opn.].) Our Supreme Court granted the defendant's petition for review and remanded the case back to the Court of Appeal "with directions to address defendant's contention that the trial court's refusal to instruct on heat of passion voluntary manslaughter constituted

---

[11] In *Beltran*, our Supreme Court cited *Breverman, supra*, 19 Cal.4th 142 and *Moye, supra*, 47 Cal.4th 537 to support its conclusion that any harm from ambiguity in an instruction on provocation introduced by the closing arguments should be reviewed under *Watson, supra*, 46 Cal.2d 818. (*Beltran*, *supra*, 56 Cal.4th at pp. 954-955.) *Beltran* is unhelpful in evaluating whether the federal Constitution requires a heat-of-passion instruction to be given because such an instruction was given in that case. (*Id.* at p. 953; see also *Thomas*, *supra*, 218 Cal.App.4th at pp. 643-644 [distinguishing *Beltran*].)

24

federal constitutional error." (*People v. Thomas* (Aug. 29, 2012, S203557).)  Acting on this remand, the Court of Appeal then reversed the defendant's conviction of second degree murder by concluding that the failure to give a heat-of-passion instruction was a federal constitutional error subject to review under *Chapman*.  (*Thomas*, *supra*, 218 Cal.App.4th at pp. 633, 642-644.)  The Attorney General's petition for review of the revised *Thomas* decision was denied.  (Oct. 30, 2013, S213262.)

The full import of *Thomas* is thus unclear.  The Court of Appeal apparently viewed our Supreme Court's directions in its remand as a signal to consider the issue— similar to the one reserved in footnote 19 of *Breverman, supra,* 19 Cal.4th at p. 170— whether the failure to give a heat-of-passion instruction violates the federal Constitution under *Mullaney, supra*, 421 U.S. 684 because it does not ensure that the jury finds true beyond a reasonable doubt each element of the charged offense.  The Court of Appeal answered in the affirmative.[12]  But the remand and subsequent denial of the petition to review the Court of Appeal's application of *Chapman, supra*, 386 U.S. 18 could alternatively indicate that a *refusal* to give a requested heat-of-passion instruction in a noncapital case may violate the federal Constitution for some reason other than that suggested by *Mullaney* and that is inapplicable in a sua sponte case.  (See, e.g., *People v. Rogers* (2006) 39 Cal.4th 826, 871-872 [considering the possibility that the failure to give a requested instruction on a lesser included offense "embodying the defense theory of the case and around which the defendant had built his or her defense" may "violate[] the defendant's due process right to present a complete defense"]; *Solis v. Garcia*, *supra*, 219 F.3d at p. 929 [same].)  Ultimately, we need not decide the difficult issue whether the error here violated the federal Constitution and should be evaluated under *Chapman, supra,* 386 U.S. 18 because we conclude that the error was prejudicial even under the less stringent *Watson* standard (46 Cal.2d 818).

---

[12] If *Mullaney, supra*, 421 U.S. 684 controls the analysis, we cannot perceive how the resolution of whether the federal Constitution is implicated because of the jury's inability to determine each element of the offense would depend on whether a heat-of-passion instruction was rejected after a request or was not given sua sponte.

4.    The instructional error was prejudicial under *Watson*.

An error is prejudicial under *Watson, supra*, 46 Cal.2d 818 if, " ' " ' "after an examination of the entire cause, including the evidence," [the reviewing court] is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " ' " (*People v. Wilkins* (2013) 56 Cal.4th 333, 351.)  As our Supreme Court has " 'made clear[,] . . . a "probability" in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' " (*Ibid.*, italics omitted.)

We conclude that there is a reasonable chance that the jury would have convicted Millbrook of attempted voluntary manslaughter based upon a sudden quarrel or heat of passion if it had been given the opportunity to do so.  The evidence conflicted as to what prompted Millbrook to shoot Manoa and what his mind state was when he fired the shot.  While there was little evidence that Manoa had a gun or that Millbrook acted in self-defense, the jury could not agree that the shooting was willful, deliberate, and premeditated.  Keeping in mind the evidence favorable to Millbrook, including the evidence that Manoa provoked their quarrel and that Millbrook spontaneously shot him, we conclude that there is more than an abstract possibility that the jury would have found Millbrook guilty of the lesser included offense of attempted voluntary manslaughter if it had been given a heat-of-passion instruction.

The likelihood of prejudice was enhanced because the prosecutor argued in closing that Millbrook shot Manoa out of anger after being provoked.  The prosecutor argued, "[Millbrook] has no defense.  Because he got mad.  He got mad when Sione Manoa used the word 'bitch' and he pulled that gun out and shot Mr. Manoa in the chest."  The prosecutor also said, in arguing that Millbrook had not acted in self-defense, "You'll be told that words do not justify this type of act of violence.  They can't.  Otherwise, it's the wild, wild west out there.  You say something about my mama, I get to shoot you.  And then you say, Hey, it was self-defense.  I get to bring a gun around until somebody says something I don't like and calls me a bitch or calls the woman I love a bitch, and then I get to shoot them . . . and try to claim it's self-defense.  None of us are

26

signed up for that." But while words alone may not justify self-defense, they may be sufficiently provocative to support a jury's finding that a defendant acted in the heat of passion (*Moye*, *supra*, 47 Cal.4th at p. 550; 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 236, p. 1059), especially when they are coupled with evidence of the kind of threatening behavior that witnesses testified occurred in this case. Thus, if it had been given a heat-of-passion instruction, the jury could have accepted the prosecutor's basic theory of the case and still concluded that Millbrook was only guilty of attempted voluntary manslaughter.

Citing *Moye*, the Attorney General argues that when a jury rejects both reasonable and imperfect self-defense, "it is unlikely that a defendant could have obtained a more favorable result with an instruction on heat-of-passion voluntary manslaughter." In doing so, she relies on *Moye*'s conclusion that the failure to give a heat-of-passion instruction in that case was harmless under *Watson, supra*, 46 Cal.2d 818 because, once the jury rejected the factual basis for both theories of self-defense, "there was little if any independent evidence remaining to support [the defendant's] further claim that he killed in the heat of passion, and no direct testimonial evidence from defendant himself to support an inference that he subjectively harbored such strong passion, or acted rashly or impulsively while under its influence for reasons unrelated to his perceived need for self-defense." (*Moye*, *supra*, 47 Cal.4th at p. 557, italics omitted.) But this discussion was based on the facts, and the facts are different here. The only evidence supporting a heat-of-passion instruction in *Moye* was the defendant's own testimony that he acted in self-defense. Thus, in rejecting the self-defense argument, the jury in *Moye* necessarily rejected the only evidence that would have supported a heat-of-passion instruction. In contrast, the jury here did not necessarily reject all the evidence supporting a heat-of-passion instruction by refusing to find that Millbrook acted in self-defense. Although it almost certainly rejected Millbrook's testimony that Manoa was holding a gun at the time of the shooting, there was significant other evidence supporting a theory of attempted voluntary manslaughter on the basis of heat of passion. *Moye* does not hold that a failure

27

to instruct on heat of passion can never be prejudicial when a jury rejects a finding of self-defense, and neither will we.

Finally, the Attorney General argues that it is "highly improbable" the jury would have found that Millbrook shot Manoa in a heat of passion because if he had, "he would have stayed at the scene and explained the shooting to the police" instead of fleeing. It is true that immediate flight may reflect a defendant's consciousness of guilt, and the jury was so instructed. (§ 1127c; *Beltran*, *supra*, 56 Cal.4th at p. 957.) But the Attorney General fails to cite any authority, and we are aware of none, supporting the proposition that defendants tend to flee only when they have committed certain crimes but not others. We do not buy the argument that Millbrook's flight demonstrates an awareness of guilt of attempted murder but not of attempted voluntary manslaughter.

Even though substantial evidence was presented that Millbrook may have been acting on a sudden quarrel or in the heat of passion when he shot Manoa, the instructions were "bereft of any indication that the jury could consider [Millbrook's] emotional excitement as a factor that could reduce his criminal culpability." (*Thomas*, *supra*, 218 Cal.App.4th at p. 645.) We conclude that there is a reasonable probability that, had it been given the opportunity, the jury would have found that Millbrook was guilty of attempted voluntary manslaughter because he was acting upon a sudden quarrel or heat of passion. Accordingly, Millbrook's conviction for attempted murder cannot be sustained.[13]

B. *Millbrook's Conviction for Attempted Murder Was Supported by Sufficient Evidence.*

We next turn to whether Millbrook's conviction for attempted murder was supported by sufficient evidence. Even though we have reversed the conviction, we must decide this issue because the People are permitted to retry Millbrook for the charge only

---

[13] Millbrook also argues that the minute order and the abstract of judgment reflecting his conviction must be modified because they incorrectly state that he was convicted of "willful, deliberate, and premeditated" attempted murder. The Attorney General concedes the error. While we agree that an error occurred, the issue is moot in light of our reversal of Millbrook's conviction for attempted murder.

28

if sufficient evidence was presented in the first trial to support it. (*United States v. DiFrancesco* (1980) 449 U.S. 117, 131; *People v. Hernandez* (2003) 30 Cal.4th 1, 6-7.) We conclude that sufficient evidence was presented to support the conviction.

In evaluating whether sufficient evidence supports a conviction, we " ' "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' " (*People v. Clark* (2011) 52 Cal.4th 856, 942-943.) We consider all the evidence presented, including circumstantial evidence, and " ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " [Citation.]' " (*Id.* at p. 943.)

"[I]ntent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime." (*People v. Smith* (2005) 37 Cal.4th 733, 741.) In particular, " '[t]he act of firing toward a victim at a close, but not point blank, range' 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill" ' " (*ibid.*), even if the defendant shoots "without advance consideration." (*People v. Arias* (1996) 13 Cal.4th 92, 162.)

Here, Millbrook admitted pointing the gun at Manoa and intentionally shooting it, and Manoa testified that the gun was no more than two feet away from him when Millbrook fired. Neither the fact that Manoa survived nor the fact that Millbrook shot only once "compel[s] the conclusion that [Millbrook] lacked the animus to kill in the first instance." (*People v. Smith*, *supra*, 37 Cal.4th at p. 741.) The evidence that Millbrook intentionally shot at Manoa's chest at close range was sufficient to permit the jury to conclude that Millbrook had the requisite express malice.

Millbrook acknowledges the principle "that [an] intent to kill can be inferred from a potentially fatal shooting at close range," but he argues that this case is distinguishable because the shooting occurred during a fight in which Millbrook felt threatened, and "the drawing of his weapon and shooting it [did] not demonstrate an intent to kill, but rather

29

demonstrated a reflexive type of reaction to protect himself and [Diaz] from harm." We disagree. This contention is tantamount to arguing that Millbrook acted in self-defense when he shot Manoa. But because the jury rejected a finding of either form of self-defense, Millbrook cannot now essentially claim that the evidence shows that he acted in self-defense.

In addition, while it is true that shooting reflexively, without thought, does not establish an intent to kill (see *People v. Arias*, *supra*, 13 Cal.4th at p. 162), Millbrook's testimony that he intentionally pulled the gun from his pants, aimed it at Manoa, and shot it was sufficient for the jury to have concluded that the shooting was not reflexive. Even if there was some evidence that the shooting was reflexive, we cannot disregard the substantial other evidence supporting the determination that Millbrook had an unlawful intent to kill when he shot Manoa. (See *People v. Lee* (2011) 51 Cal.4th 620, 632 [evidentiary conflicts do not justify reversal when reviewing for sufficiency of the evidence].)

Millbrook also argues that the prosecutor's closing argument improperly told the jury that it could convict Millbrook of attempted murder if it found he acted with a conscious disregard for life. He takes issue with the prosecutor's statements that (1) "everybody knows when you point a gun at somebody and it goes off, horrible, horrible things happen"; (2) "[w]hen you point a gun at somebody's chest and pull the trigger, what else are you trying to do?"; (3) "[w]hat did [Millbrook] think was gonna happen? You shoot a man in the chest. He is trying to stop [Manoa] permanently"; and (4) "we don't have a window in[to] people's minds. The instructions basically allow you to consider their conduct [in determining intent]. And if any of us are standing there and watching me shoot somebody from this distance, there would be no question. Of course I'm trying to kill [Manoa] when shooting him in the chest from this far."

We do not perceive how these remarks bear on whether the evidence was sufficient to support Millbrook's conviction of attempted murder. The prosecutor made the statements in closing argument, and they were not evidence, as the jury was instructed. (*People v. Stanley* (2006) 39 Cal.4th 913, 961, fn. 10 [" '[i]t is axiomatic that

30

argument is not evidence' "].) To the extent Millbrook attempts to suggest that the remarks constituted prosecutorial misconduct, he has waived the claim by not previously objecting to them. (See *People v. Gray* (2005) 37 Cal.4th 168, 215.) And even if he had preserved the claim, we would reject it on its merits. The prosecutor's statements accurately reflect the principles that " '[a] defendant's specific intent to commit a crime may be inferred from all of the facts and circumstances disclosed by the evidence' " (*People v. Scott* (2011) 52 Cal.4th 452, 488) and that, in particular, "the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice." (*People v. Smith*, *supra*, 37 Cal.4th at p. 742.) The jury was expressly instructed that to find Millbrook guilty of attempted murder it had to find that he intended to kill Manoa. There was no misconduct.

We conclude that sufficient evidence supports Millbrook's conviction for attempted murder. Thus, the People may retry him on this charge if they elect to do so. But if they do not elect to do so, we order that the judgment be modified to reflect a conviction of attempted voluntary manslaughter. We are " 'not restricted to the remedies of affirming or reversing [the] judgment. Where the prejudicial error goes only to the degree of the offense for which the defendant was convicted, the appellate court may reduce the conviction to a lesser degree and affirm the judgment as modified, thereby obviating the necessity for a retrial.' " (*People v. Edwards* (1985) 39 Cal.3d 107, 118; *Thomas*, *supra*, 218 Cal.App.4th at p. 647; see § 1260.) Accordingly, the People will have the option of retrying Millbrook for attempted murder or accepting a modification of the judgment to reflect a conviction for attempted voluntary manslaughter and to strike the enhancement allegation under section 12022.53, subdivision (d). (See *Edwards,* at p. 118.) If the judgment is so modified, the trial court will have the opportunity to resentence Millbrook.

C.      *The Admission of Evidence of an Uncharged Prior Incident Was Harmless.*

At trial, Michael Pina was allowed to testify that in August 2008 Millbrook brandished a gun during a confrontation between the two. Over Millbrook's objection,

31

the testimony was allowed to show a common plan or scheme of using a gun when confronted with perceived threats. Millbrook argues that this evidentiary ruling violated his federal constitutional right to due process.[14] We conclude that any error in allowing evidence of this prior incident was harmless.

Pina testified that he did not interact with Millbrook after they had their physical fight at high school until Millbrook pulled his car up behind Pina when he was walking down the street. Pina put his hands up and called Millbrook a "bitch" because he thought Millbrook might be trying to hit him with the car. Millbrook said, "What?" and drove away. Pina testified that later that day he was walking home when Millbrook came upon him again in his car. Millbrook's father got out of the car, cursed at Pina, and hit Pina's eye. Pina pushed Millbrook's father away, and then Millbrook got out of the car and pointed a revolver at Pina from 10 to 12 feet away, angrily telling Pina that he was the "bitch" now. Pina testified that he feared for his life but stood his ground, and Millbrook and his father eventually left. Millbrook denied that the confrontation had happened the way Pina described it but did not provide an alternative version.

Pina reported the incident to the police. An officer with the Alameda County Sheriff's Office testified that when he took Pina's report, Pina did not have any visible injuries. Millbrook was never arrested or charged. The officer acknowledged, however, that his declining to forward the report to the district attorney was probably a mistake.

Before trial, Millbrook moved to exclude evidence of the incident. The prosecution argued that the evidence was admissible to establish Millbrook's "common plan to respond to all perceived threats by using a handgun." The court observed that the evidence "would go more towards motive or maybe slightly under a plan [¶] . . . [¶] or in terms of that type of response," and it ruled that the evidence was sufficiently probative

---

[14] We consider this claim and Millbrook's remaining claims, notwithstanding our reversal of the attempted murder conviction, because they bear on his convictions for assault and because they bear on any modified judgment for attempted voluntary manslaughter.

to be admissible despite being prejudicial.[15]  Although the court thus identified a few issues to which the evidence might be relevant, the jury was subsequently instructed that it could only consider the evidence "for the limited purpose whether the defendant had a plan or scheme to commit the offenses charged in this case."

Under Evidence Code section 1101, evidence that a defendant "committed an uncharged offense may be admitted if relevant to prove some relevant fact other than the defendant's character" or disposition, such as a "common design or plan."  (*People v. Balcom* (1994) 7 Cal.4th 414, 422.)  " 'When reviewing the admission of evidence of other offenses, a [trial] court must consider:  (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant.  [Citation.]  Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." ' "  (*People v. Fuiava* (2012) 53 Cal.4th 622, 667.)  We review the court's admission of such evidence for abuse of discretion.  (*Id.* at pp. 667-668.)

Evidence of uncharged acts suggesting "a common design or plan is admissible to establish that the defendant committed the act alleged . . . in the manner alleged" but "not to prove the defendant's intent or identity."  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 394, fn. 2, 399, italics omitted.)  Such evidence "must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations.' "  (*Id.* at p. 402.)  However, while the similarities between the charged and uncharged offenses "must indicate the existence of a plan rather than a series of similar spontaneous acts, . . . the plan thus revealed need not be distinctive or unusual."  (*Id.* at p. 403.)

---

[15] The court granted Millbrook's motion to exclude evidence of another incident in which the police found him in possession of a gun, but at trial defense counsel elicited testimony about that incident from Millbrook.

We agree with Millbrook that the August 2008 incident was not sufficiently similar to the charged offenses to suggest that it and the shooting were part of a common plan. The only similarity between the incidents was that both times Millbrook pulled a gun when someone threatened or insulted him or someone close to him. Otherwise, the incidents, which were separated by over a year, involved different people, different circumstances, and different outcomes (most obviously because Millbrook did not shoot the gun in August 2008). Pulling a gun in reaction to conflict is not the type of "plan" contemplated in Evidence Code section 1101. (See *People v. Sam* (1969) 71 Cal.2d 194, 204-205 [evidence that " 'when there is a confrontation between the defendant and someone else with whom he disagrees . . . he kicks the person' " was not admissible to establish a common plan].) We otherwise perceive "no connecting link between the prior and present acts," and we conclude that they "were independent of one another and apparently spontaneous in each instance." (*Id.* at p. 205.)

The evidence was inadmissible to establish a common plan or scheme for the additional reason that the primary issue at trial was Millbrook's intent, not whether he "committed the act alleged . . . in the manner alleged." (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 394, fn. 2, italics omitted.) There was no real dispute that Millbrook pulled out his gun, aimed it at Manoa, intentionally shot it, and injured Manoa and Galvan. The only elements of the charged offenses and enhancements not established by these undisputed facts related to Millbrook's intent and whether he acted in self-defense. While there was a question whether Millbrook accidentally cocked the gun—which bore on how quickly he formed the intent to shoot Manoa—the August 2008 incident had no bearing on that issue because there was no evidence that Millbrook cocked the gun on that occasion.

We recognize the principle that in general, "[i]f a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below." (*People v. Brown* (2004) 33 Cal.4th 892, 901.) But the Attorney General has not identified any other basis on

34

which this evidence was admissible, and we express no opinion whether any such basis may exist should Millbrook be retried.

Ultimately, we need not determine whether the evidence was properly admissible on another basis because we conclude that any error in its admission was harmless. Based on the undisputed facts, the only way that the jury could have reasonably concluded that Millbrook was not guilty of either attempted voluntary manslaughter or assault with a firearm causing great bodily injury would have been if it determined that Millbrook acted in reasonable self-defense. In order to have made such a determination, the jury would have had to believe that Millbrook reasonably believed that Manoa had a gun and had pulled it out before Millbrook shot him. The only evidence that Manoa pulled a gun, or even had a gun at all, was Millbrook's testimony. Manoa denied having a gun, no witness other than Millbrook saw Manoa with a gun, and no such gun was ever recovered.

Moreover, Millbrook had the opportunity to put the August 2008 incident—which happened less than a month after Sandoval shot at him—in context as part of a long-standing conflict with Pina and the Gun Boys. In fact, evidence of the conflict between Pina's group and Millbrook played a key role in Millbrook's defense because he relied on it to explain why he carried the gun to Placencia's party and why he felt threatened when surrounded by Manoa and Manoa's friends.

Finally, the prosecution placed little reliance on the August 2008 incident to make its case, not mentioning it in the opening argument and mentioning it only briefly in closing.

Given the weak evidence that Millbrook acted in reasonable self-defense and the minor role the August 2008 incident played in the parties' cases, we conclude that any error in the admission of Pina's testimony about the prior incident was harmless beyond a reasonable doubt (*Chapman*, *supra*, 386 U.S. at p. 24) and that it was not reasonably probable that Millbrook would have received a more favorable verdict if the court had excluded the testimony. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

D.      *Millbrook's Motion to Dismiss a Juror Was Properly Denied.*

Millbrook contends that he was denied his federal constitutional right to a fair trial and his convictions must be reversed because the trial court did not dismiss a juror who criticized his counsel.  We disagree.

Under section 1089, the trial court may discharge a sitting juror whom the court finds, "upon . . . good cause shown[,] . . . to be unable to perform his or her duty."  We review the determination whether to discharge a juror under a "heightened" abuse of discretion standard.  (*People v. Wilson* (2008) 44 Cal.4th 758, 821.)  Under this standard, "a juror's inability to perform as a juror must be shown as a 'demonstrable reality' [citation] which requires a 'stronger evidentiary showing than mere substantial evidence.' "  (*Ibid.*)

After the prosecution had presented its last witness, juror No. 12 sent a note to the court about defense counsel that read:  "Mr. Pointer, is he playing 'dirty pool' [sic]?  Is it fair to question/bring damage to witness' [sic] claims?  Do events need to be corroborated where it's a 1:1 incident; ie [sic] no witnesses?  Mr. Pointer's interview techniques can be disgusting/untoward or humiliating.  Is this appropriate court conduct?"

With the prosecutor and defense counsel present, the court asked the juror whether his opinion of defense counsel would affect his ability to be fair and to make a decision, and the juror repeatedly said it would not.  Both counsel questioned the juror about the note, and he stated that he could be fair, would not hold the attorneys' styles against them, and no longer had the feelings about defense counsel he had expressed in the note.  The court also answered the questions posed in the note, explaining that the jury instructions would address the issue of corroboration and that the attorneys could use whatever style they wished as long as it was appropriate.

After the juror left the courtroom, the defense moved for his dismissal.  The court denied the motion, finding that the juror was "very forthright and candid," that "he completely understood" his duty was to decide based on the evidence, and that he realized his feelings "should [not] affect his judgment."

36

The evidence fails to establish that juror No. 12 was unable to perform his duty. While the juror's note expressed strong feelings about defense counsel's cross-examination style, the juror reiterated that his opinions would not affect his decision and stated that he no longer even held those opinions. The denial of the motion to dismiss juror No. 12 did not violate section 1089, and we therefore also reject Millbrook's federal constitutional claim that he was denied an impartial jury. (See *People v. Martinez* (2010) 47 Cal.4th 911, 943, fn. 1.)

E. *Cumulative Error Does Not Justify Reversing Millbrook's Other Convictions.*

Millbrook contends that the cumulative effect of the errors he identifies requires reversal of his convictions, even if none of the errors individually requires reversal. Because we conclude that his conviction for attempted murder must be reversed, we need not consider the failure to give a heat-of-passion instruction in our consideration of this claim. The only other potential error we have identified was the admission of evidence of the August 2008 incident, and it does not justify reversal of his remaining convictions for the reasons already given.

III.

DISPOSITION

Millbrook's convictions for assault are affirmed. His conviction for attempted murder is reversed. The People shall have 60 days from issuance of the remittitur to decide whether to retry him for attempted murder. If the People do not file a charge of attempted murder within that time frame, the judgment shall be modified to reflect Millbrook's conviction for attempted voluntary manslaughter instead of attempted murder and to strike the enhancement allegation under section 12022.53, subdivision (d). As so modified, the judgment is affirmed.

37

 

_____

Humes, J.

We concur:

_____

Reardon, Acting P.J.

_____

Rivera, J.

*People v. Millbrook* (A134382)

38

Trial Court:                       Alameda County Superior Court

Trial Judge:                     Honorable Kevin Murphy

Counsel for Appellant:       Linda M. Leavitt, under appointment by the First District Appellate Project

Counsel for Respondent:     Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, René A. Chacón, Supervising Deputy Attorney General, Bruce Ortega, Deputy Attorney General

39