Filed 6/2/16  P. v. Weber CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C078550 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F7093) |
| v. | |
| BRADLEY JAMES ANDREW WEBER, | |
| Defendant and Appellant. | |

Defendant Bradley James Andrew Weber shot his son in the back and killed him. A jury convicted him of second degree murder, rejecting his defense that he was not the shooter.  He urges us to reverse the judgment because the trial court refused to instruct the jury on the lesser included offenses of voluntary manslaughter in the heat of passion

1

and voluntary manslaughter based on unreasonable self-defense. The essence of defendant's appeal is that evidence his son B.J. had assaulted him in the recent past and father and son, both intoxicated, were engaged in a heated argument at the time of the shooting constitutes substantial evidence he did not entertain the requisite malice to sustain the murder conviction. The flaw in defendant's argument is there is no evidence their quarrel objectively was of a nature that a reasonable person would have lost reason, or that subjectively defendant had become so angry and irrational, or that he actually but unreasonably believed he was in imminent danger of death or great bodily injury. In the absence of evidence of what defendant's state of mind actually *was* at the time of the shooting and not what it *might* have been, the court properly refused to instruct on either variant of voluntary manslaughter. The judgment is affirmed.

## FACTS

This case involves a coterie of relatives with drug and medical problems, living in the aftermath of a devastating fire in Shasta County in 2013. William Romero (Will), who is blind, lived on rural property that had burned in the fire. His drug of choice was marijuana. His daughter's mother Sheila visited frequently with his daughter, who is autistic. His mother's home, which had been located up the hill from his parcel, was completely destroyed. On the day of the shooting, Will, his sister, and his niece were digging through the ashes trying to find any remnants of jewelry or mementos.

Defendant had moved a trailer onto the scorched property to help with the cleanup. The victim, B.J., set up a tent close by. Defendant and B.J. both drank heavily and used methamphetamine. Defendant's girlfriend, Pamela Glasgow (Pam), was drunk often and also used methamphetamine. She admitted defendant "smacked [her] around" a couple of times. B.J.'s girlfriend, Misty Darden, stayed in the tent with B.J. and her four-month-old son Payton. Misty, a military veteran, had brain cancer and took medication to control her seizures.

2

Defendant and B.J. had a close relationship, but when they were under the influence of drugs and alcohol, which was frequently, they fought. During one of those fights less than a month before the fatal shooting, defendant hit B.J. in the back with a long gun. B.J. knocked defendant to the ground, rendering him unconscious for about 40 minutes. Initially, B.J. told defendant that defendant had been attacked by some unknown persons, but later he explained that he had knocked him out.

On November 2, 2013, Misty and B.J. were helping with the cleanup. B.J. and defendant were drinking that afternoon. Sometime in the afternoon defendant visited his friend Terry Rawlins. According to Rawlins, defendant had been drinking but did not appear to be drunk. Defendant showed Rawlins a .22 caliber, semiautomatic pistol he retrieved from his trunk.

By dusk, B.J. and Misty wanted to go to town for some chicken. B.J. asked to borrow his father's car. His father refused. An argument ensued about the car and whether Misty would leave the baby with Pam, who was drunk. Defendant insisted that they leave the baby; Misty refused. B.J. told Misty to take the baby and leave. She complied and began walking to Will's trailer. Within a few minutes, B.J. drove past her in a quad, shouting, "He shot me, he shot me."

B.J. drove the quad to Will's trailer, desperate for help. When he got inside the trailer, in a panic he announced, "I have been shot. Uncle Will, my dad shot me in the back. You got to get me to the hospital." Will helped him into the passenger seat of Sheila's Jeep. Sheila jumped behind the wheel of the Jeep as Will put their daughter in the backseat, and she raced off to the hospital. They stopped and picked up Misty and the baby. B.J. was bleeding heavily. It was a 20-minute drive to the hospital.

Meanwhile, Will walked up to defendant's trailer and confronted him about the shooting. Pam fell to her knees, saying she had told defendant that he shot B.J. Defendant responded, "I shot him?" Will confirmed that defendant had shot B.J., and

3

defendant drove off.  He did not deny shooting his son.  Shortly thereafter defendant and Pam went to Crescent City.  They did not go to the hospital or check on B.J.'s condition.

B.J. died from a gunshot wound to the back.  The pathologist recovered a .22-caliber bullet from his chest, with the entry wound in his back.

Police investigators found two .22-caliber casings near the exterior door of defendant's trailer, another .22-caliber cartridge casing under his bed, and other live .22-caliber ammunition inside the trailer.  They did not find a firearm.  The expended casings located outside the trailer and the casing found inside the trailer were fired from the same firearm.

Defendant called Will the following day.  Will accused defendant again of shooting B.J.  Defendant did not deny it.  Defendant and Pam eluded authorities for eight days.  They were arrested in Crescent City.  Another live .22-caliber cartridge was found in the toilet of their motel room.  The brand of the cartridge was different from the ones found in defendant's trailer.

Defendant admitted having an argument with B.J. over the car and the baby, but he denied shooting him.  He also admitted possessing a .22-caliber pistol, but he told detectives he did not know where it was.

Pam married defendant after the shooting.  She testified she could recall very little of what had happened because she was drinking heavily and consuming methamphetamine.  She could recall, however, that B.J. kicked and punched defendant because defendant had said something negative about one of his ex-girlfriends.  She also recalled seeing B.J. with a pellet gun and a "sawed-off gun."  She testified she saw B.J. drive off on his quad with Misty and the baby about one-half hour after the argument.

Defendant's daughter testified that her father and B.J. had a close relationship.  She acknowledged that they bickered and "roughhouse[d]" over the years but insisted that their bickering never became physical or violent.  She described her brother as "rambunctious."

4

Defendant was charged with murder.  (Pen. Code, § 187, subd. (a).)  The prosecution also alleged that he personally and intentionally discharged a firearm during the commission of the murder (Pen. Code, § 12022.53, subd. (d)) and that he had suffered a previous serious or violent felony conviction under the "three strikes" law (Pen. Code, § 1170.12).  Following 45 minutes of deliberations, the jury found defendant guilty of the lesser included offense of second degree murder, also finding the personal and intentional discharge of a firearm enhancement true.  The court found the prior strike allegation also true.  The court sentenced defendant to state prison for a total term of 55 years to life and, among other fines, fees, and assessments, imposed a 15 percent administrative fee.  Defendant appeals.

## DISCUSSION

## I

## Voluntary Manslaughter:  Heat of Passion

A trial court has a duty to instruct the jury on all lesser included offenses if there is substantial evidence the defendant committed the lesser, but not the greater, offense.  (*People v. Williams* (2015) 61 Cal.4th 1244, 1263; *People v. Breverman* (1998) 19 Cal.4th 142, 148-149 (*Breverman*).)  Evidence is substantial if a reasonable jury could find it persuasive.  (*People v. Benavides* (2005) 35 Cal.4th 69, 102.)

"Manslaughter is a lesser included offense of murder. . . .  Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. . . .  Heat of passion . . . is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation.  While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice."  (*People v. Beltran* (2013) 56 Cal.4th 935, 942, fn. omitted.)  Defendant contends the trial

court committed reversible error by failing to instruct on these principles. As support, he urges us to consider *People v. Millbrook* (2014) 222 Cal.App.4th 1122 (*Millbrook*).

Because of the abundance of evidence to support the voluntary manslaughter instruction in that case, *Millbrook* actually exposes the weakness in defendant's argument, premised, as it is, on the thinnest of speculative inferences a juror might have drawn in contrast to the volume of evidence offered in *Millbrook* that necessitated the instruction. Jeremy Millbrook was a skinny 18 year old who initially resisted his girlfriend's invitation to join a party at her friend's house because he was afraid of a group of boys he thought might also attend. (*Millbrook*, *supra*, 222 Cal.App.4th at p. 1128.) Eventually he relented but kept a gun in his waistband to protect himself should any threats arise. (*Ibid.*) The hostess, a Target employee, had invited many of her friends from Target to the party, including two security guards, Sione Manoa and Matthew Galvan. (*Id.* at p. 1127.) Manoa was 5 feet 10 inches tall and weighed about 235 pounds; Galvan was 6 feet 4 inches tall. (*Id.* at p. 1131.) The hostess did not want the partygoers to be in her house other than to use the bathroom. But she became too intoxicated to monitor the party and so sick she ended up in bed. (*Id.* at pp. 1128-1129.)

Her friend, Millbrook's girlfriend Jennifer Diaz, attempted to enforce the "no house" policy. (*Millbrook*, *supra*, 222 Cal.App.4th at pp. 1128-1129.) In doing so, she confronted Manoa and a very heated argument ensued. (*Id.* at p. 1129.) Others tried to calm the situation and Diaz went outside. Shortly thereafter, another friend of the hostess asked Manoa to leave. (*Id.* at pp. 1129-1130.) They, too, got into an argument. Millbrook described the argument as " 'very intense' "; he had " 'never seen anyone so angry.' " (*Id.* at p. 1130.) Earlier he had heard Manoa say, " 'I got my thing. I got my thing.' " (*Ibid.*) He believed Manoa meant that he had a gun. (*Ibid.*)

Galvan stood in front of Manoa with his hand on Manoa's chest in an attempt to persuade Manoa to leave the party. (*Millbrook*, *supra*, 222 Cal.App.4th at p. 1131.) Diaz returned and Manoa, who was still enraged, told her, " 'Shut the fuck up, bitch.' " (*Id.* at

p. 1132.)  Millbrook was angry Manoa had called Diaz a "bitch" and felt he needed to defend her.  (*Ibid.*)  Millbrook and Manoa exchanged obscenities.  According to Millbrook, Manoa moved toward him, " 'reaching, long steps, hands in the air, gestures,' " and trying to get around Galvan, who was holding him back.  (*Ibid.*)  From Millbrook's perspective, it looked like Manoa was grabbing a gun and preparing to shoot him or his girlfriend.  (*Id.* at p. 1134.)  He then saw Manoa point a " 'fairly big' " semiautomatic with his arm fully extended.  (*Ibid.*)  Scared, Millbrook panicked, pulled out his gun, and shot.  Both Manoa and Galvan were injured.  (*Id.* at pp. 1134-1135.)  The trial court did not give, and Millbrook did not request, a heat-of-passion instruction.  (*Id.* at p. 1136.)  A jury convicted Millbrook of the attempted murder of Manoa and an assault with a firearm on Manoa and Galvan.  (*Id.* at p. 1126.)

The Court of Appeal reversed the attempted murder conviction, finding substantial evidence upon which the jury could have found that Millbrook was acting under the actual influence of extreme emotion.  "This evidence included testimony that Manoa had acted belligerently throughout the party and had engaged in intense arguments with [his girlfriend and her friend]; testimony that Manoa was the one who escalated the fight with Millbrook; testimony that Manoa, who was much bigger than Millbrook, had clenched his fists and 'lunged' at Millbrook before being shot; testimony that Galvan intervened in the argument and had his hand on Manoa to prevent a physical altercation; testimony that Manoa had threatened to get someone to beat Diaz and told Millbrook to 'check your bitch' immediately before the shooting; testimony that Millbrook was angered by Manoa's treatment of Diaz; and testimony that Millbrook had been threatened in violent incidents in the past and was intimidated by Manoa's size and by being surrounded by Manoa's friends."  (*Millbrook*, *supra*, 222 Cal.App.4th at pp. 1139-1140.)  The court's laundry list of evidence constitutes substantial evidence of the subjective component of voluntary manslaughter, that is, that a defendant must have attempted to kill while under the actual influence of a strong passion.  (*Id.* at p. 1139.)

7

The court also catalogued the substantial evidence that objectively there was sufficient provocation. "Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection" under the given facts. (*People v. Enraca* (2012) 53 Cal.4th 735, 759.) Either the victim must cause the provocation or the defendant must reasonably believe the victim caused it. (*Millbrook*, *supra*, 222 Cal.App.4th at p. 1140.) The court first identified Manoa's treatment of Millbrook's girlfriend and the obscenities he hurled at her. (*Id.* at pp. 1139-1140.) "The jury also could have found adequate provocation based on Manoa's other belligerent and threatening behavior. As mentioned above, this evidence included testimony that Manoa had been aggressive throughout the night, including engaging in shouting matches with [his girlfriend and her friend]; testimony that Manoa was the one who escalated the fight with Millbrook; testimony that Manoa had his hands clenched and 'lunged' at Millbrook immediately before being shot; and testimony that Galvan intervened right before the shooting with his hand on Manoa to prevent an escalation of the argument. In short, evidence of Manoa's treatment of Diaz and of Manoa's menacing behavior was sufficient to permit a jury to conclude that a reasonable person in Millbrook's position could have acted in the heat of passion." (*Id.* at p. 1141.)

Contrast this wealth of evidence with the meager showing defendant offers here. Unlike Millbrook, defendant chose not to testify. Thus, the jury in *Millbrook* heard the defendant explain that he was actually scared, he felt a rush of anxiety and adrenaline as Manoa lunged at him, and he was surrounded by what appeared to be Manoa's friends, which also reminded him of how he previously had been threatened by a group known as " 'the Gun Boys.' " (*Millbrook*, *supra*, 222 Cal.App.4th at p. 1132.) There were ample witnesses to the shooting, all of whom the jury heard describe what had occurred over the course of the evening and in the moments immediately preceding the shooting.

8

In this case, however, there were no witnesses to the actual shooting other than the decedent and defendant. The prosecutor argued that B.J. identified his perpetrator when he told Misty, "He shot me, he shot me" and when he told Will, "my dad shot me." The prosecutor insisted that B.J. had no motive to lie, particularly since he stated he knew he was dying. There is no other evidence to explain what was said or done immediately before defendant shot him in the back.

Defendant tries to draw parallels to *Millbrook*. He likens his fear of his son to the fear Millbrook had of those who had tormented him in the past. He points to the evidence that B.J. had knocked him unconscious less than a month before the shooting and the testimony of multiple witnesses that the two had become embroiled in physical altercations in the past, and his daughter's testimony that her brother could be "rambunctious." Misty and Pam both confirmed that B.J. and defendant were in a heated argument over the car and the baby before Misty took the baby and left and Pam went inside the trailer. In defendant's view, he, like Millbrook, was subjectively frightened by the victim and objectively had sufficient provocation to shoot him. We disagree.

There is little similarity between the situation that Millbrook found himself in and the argument the elder Weber escalated. There was overwhelming evidence that Manoa, the victim in *Millbrook*, was an ominous presence—angry, threatening, large, and possibly armed. He was accompanied by another large man, security guard Galvan. While Manoa may or may not have ever displayed a firearm, Millbrook testified he believed he saw one and he was haunted by the vulnerability he had felt when threatened by the Gun Boys. Millbrook had no preexisting relationship with Manoa, no reason to know or understand him, and had observed a quick escalation of a life-threatening situation.

By contrast, defendant knew and loved his son, although they often argued when they drank. The precipitating event was petty. Defendant was annoyed because Misty did not want to leave her infant with his drunk girlfriend. There is absolutely no evidence

9

that B.J.'s request to borrow the car actually inflamed defendant or that the dispute over the car or the baby was sufficient provocation to incite a reasonable person. Indeed, the overwhelming evidence is to the contrary.

Will interacted with defendant on two occasions following the shooting, and at neither time did defendant evidence extreme emotion, passion, or irrationality. Rather, when confronted with the accusation that he had shot his son, he calmly inquired, "I shot him?" Defendant did not deny the accusation, either in person on the night of the shooting or on the telephone the following day. Nor did he go to the hospital and check on his son's condition. Instead, he fled to Crescent City.

Defendant would have us speculate that the argument escalated to such a degree that he did, in fact, lose his ability to reason and acted in the heat of passion. But there is no evidence to support his conjecture. It is true that based on their history of quarreling, he might have been more susceptible to a rash response and that he could have overreacted. We must evaluate what the evidence actually is, however, not what it might have been. And here the only evidence we have is that defendant shot his son in the back after an argument over borrowing the car and taking the baby. Whereas young Millbrook found himself in a threatening situation not of his own making, the only testimony the jury heard was that defendant argued with B.J. and denied his request to borrow the car because of a slight to his drunk girlfriend, now his wife. We agree with the trial court that there is no evidence to support either the subjective or objective elements of voluntary manslaughter as there was in *Millbrook*. Past altercations alone do not constitute substantial evidence that on the night in question a reasonable person would become so inflamed over a request to borrow the car and take the baby that he would kill someone. Nor is there any evidence that defendant was embroiled in such a heat of passion he lost his ability to think. The trial court had no duty to instruct on a lesser included offense based solely on conjecture and speculation.

## II

## Voluntary Manslaughter:  Unreasonable Self-Defense

Defendant relies upon the same speculative inferences to justify his request for an instruction on voluntary manslaughter based on his actual, but unreasonable, belief that his life was endangered.  The trial court properly denied his request for an instruction on unreasonable self-defense.

"If a person kills or attempts to kill in the unreasonable but good faith belief in having to act in self-defense, the belief negates what would otherwise be malice, and that person is guilty of voluntary manslaughter or attempted voluntary manslaughter, not murder or attempted murder." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116.)  The unreasonable self-defense variant of voluntary manslaughter is also a necessarily included offense of murder (*People v. Booker* (2011) 51 Cal.4th 141, 181-183), and therefore a trial court must instruct on it provided there is substantial evidence to support the lesser offense (*Breverman*, *supra*, 19 Cal.4th at p. 162).  Substantial evidence is not any evidence, no matter how weak, but evidence from which a reasonable jury could find the existence of the facts underlying the instruction and that the defendant was guilty only of the lesser offense.  (*People v. Moye* (2009) 47 Cal.4th 537, 553-555.)

The doctrine of unreasonable self-defense, otherwise known as imperfect self-defense, is narrow.  " 'It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. . . .  Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.  The defendant's fear must be of *imminent* danger to life or great bodily injury.  " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*' " ' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

Defendant relies on B.J.'s conduct, not on the night of the shooting, but in the weeks and months that preceded it.  Again he relies on evidence that B.J. was

11

"rambunctious" and that the father and son "roughhouse[d]." In particular, he points to the evidence that B.J. had knocked him unconscious weeks before the killing as evidence warranting the instruction. But there is no evidence that B.J. had threatened defendant or engaged in any physical altercation with him on November 2 to give rise to a belief, reasonable or not, that lethal force was required to repel him. Pam, the only person who remained in the vicinity of the shooting, did not offer any statement or testimony to support the suggestion that defendant feared for his life and subjectively believed he needed to exert lethal force in self-defense. As the Attorney General aptly summarizes: "This paucity of evidence left the jury, if given such an instruction, to speculate about some scenario, devoid of evidentiary tether, where [defendant] perceived he was under attack and he subjectively believed lethal defense was required. Such rank conjecture cannot satisfy the requirement of substantial evidence warranting instruction on imperfect self-defense. (*People v. Mendoza* (2000) 24 Cal.4th 130, 174; see also *People v. Young* (2005) 34 Cal.4th 1149, 1200.)"

## III

### Administrative Fee on Restitution Fine

Defendant objects to a 15 percent administrative fee the trial court ordered in addition to the $1,042 he was ordered to pay for victim restitution. In *People v. Eddards* (2008) 162 Cal.App.4th 712 (*Eddards*), we held that Penal Code section 1203.1 authorized imposition of an administrative fee only where restitution was paid directly to the victim and not to the restitution fund. (*Eddards*, at p. 717.) Defendant maintains that pursuant to *Eddards*, the administrative fee is unauthorized and must be stricken. We agree.

The probation report recommended: "The Victim Compensation and Government Claims Board (VCGCB) is seeking restitution in the amount of $1,042.00; $961.00 of which was the benefit paid for the victim's funeral and burial charges, and $81.00 paid for mental health services for one of the three derivative victims, Rocksan Weber (the

12

victim's mother).  Two other derivative victims have open claims; Jessica W. (the victim's sister) and Braeden M.; however no monies have been paid to date.  It is recommended restitution be reserved to VCGCB."

At sentencing the trial court stated:  "The restitution fine of $10,000.00 for this conduct is -- and this term is not appropriate, and, so, I am imposing that under [Penal Code section] 1202.4.  There's a parole revocation restitution fine of $10,000.00 which I am suspending.  That will remain suspended, unless parole would be revoked.  That's under [Penal Code section] 1202.45.  [¶] . . . [¶]

"I'm ordering victim restitution in the amount of $1,042.00, plus a 15 percent administrative fee I'm -- as stated, to the Victim Compensation, et cetera, Board.  I'm reserving any further restitution."

The Attorney General argues that although the trial court imposed a "Restitution Fund fine of $10,000," it also awarded "actual restitution of $1,042.00 for cost of burial and other claims by victims."  In the Attorney General's view, if the restitution is calculated based on costs actually incurred, the administrative fee can be imposed and *Eddards* does not apply.  The Attorney General misreads the court's order, our opinion in *Eddards*, or both.

The question is not whether the restitution costs are actually incurred, as the Attorney General argues, but whether the restitution is ordered to be paid directly to one or more of the victims.  *Eddards* made clear that the administrative fee is not authorized for an order of restitution made to the compensation claims board to reimburse restitution the board has paid to victims.  (*Eddards*, *supra*, 162 Cal.App.4th at pp. 716-717.)  Here the court ordered defendant to pay $1,042.00 to the Victim Compensation and Government Claims Board to reimburse it for the actual burial and mental health expenses paid to the victims.  Thus, the 15 percent administrative fee was not authorized by statute and must be stricken.

13

## DISPOSITION

The 15 percent administrative fee is stricken.  In all other respects, the judgment is affirmed.

                RAYE           , P. J.

We concur:

         BUTZ          , J.

        MAURO       , J.