Filed 6/8/26  P. v. Dunlap CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B344075 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA099666) |
| v. | |
| ANTHONY TERRELL DUNLAP, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel B. Feldstern, Judge.  Affirmed.

Owen P. Martikan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Julie A. Harris and Melanie Dorian, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Anthony Terrell Dunlap guilty of five counts of second degree robbery based on two separate incidents at Macy's stores.  The trial court denied Dunlap's pretrial motion for mental health diversion.  The court found Dunlap ineligible for diversion after concluding the prosecution rebutted the statutory presumption that Dunlap's qualifying mental disorders were a significant factor in his commission of the offenses.  (Pen. Code, § 1001.36, subd. (b)(2).)[1]  On appeal, Dunlap contends the evidence was insufficient to support this determination.  He also asserts the trial court erred by failing to instruct the jury on the lesser included offense of grand theft as to three of the five counts.

We conclude that substantial evidence supported the trial court's finding that Dunlap is ineligible for diversion under section 1001.36, subdivision (b)(2).  We also conclude the trial court did not err by refusing to instruct the jury on the lesser included offense of theft.  We therefore affirm the order and judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

This case concerns two separate incidents during which Dunlap stole fragrances from Macy's stores and assaulted and threatened store loss prevention officers.  The first took place on January 12, 2023, in Santa Clarita, and the second on March 14, 2023, in Northridge.  The cases were consolidated, and the People

---

[1]     All undesignated statutory references are to the Penal Code.

charged Dunlap with five counts of second degree robbery in violation of section 211.[2]

The jury found Dunlap guilty of all five counts. The trial court sentenced Dunlap to a total prison term of six years. The court suspended execution of the sentence and placed Dunlap on five years of formal probation. At Dunlap's request, the court ordered as a condition of probation that he complete a two-year residential drug and alcohol treatment program.

Dunlap timely appealed.

## DISCUSSION

### I. The Trial Court Did Not Abuse Its Discretion in Denying Mental Health Diversion

#### A. Background

In May 2024, Dunlap, through counsel, filed a motion for mental health diversion in which he stated he consented to diversion and agreed to comply with treatment as a condition of diversion.[3] He attached a conditional acceptance to a residential treatment program for drugs and alcohol.

Dunlap submitted a psychological assessment in support of the motion. In the assessment, a psychologist diagnosed him with opioid use disorder, stimulant use disorder—cocaine type, unspecified schizophrenia spectrum/other psychotic disorder, and

---

[2] The operative first amended information alleged two counts (counts 1 & 2) as to the Santa Clarita incident and three counts (counts 3 to 5) as to the Northridge incident.

[3] On November 4, 2024, the trial court granted Dunlap's request to proceed in propria persona. On December 3, 2024, after empaneling the jury but before testimony began, Dunlap requested reappointment of counsel. The trial court appointed counsel.

3

major depressive disorder. The psychologist noted that Dunlap was 34 years old with no history of psychiatric hospitalization, counseling, or a previous mental disorder diagnosis.

The psychologist opined that Dunlap's mental disorders played a significant role in his offenses. The psychologist stated that because of Dunlap's "multiple disorders including Major Depression and Unspecified Schizophrenia Spectrum/Other Psychotic Disorder," his "capacity for impulse control would already be compromised." The psychologist further explained that "the concurrent use of Opioid and [stimulants] at the time of the offenses likely significantly impaired his judgment and decision-making abilities. Substance use can magnify the symptoms of depression and psychosis, potentially leading to disorganized thinking, emotional instability, and erratic behavior, all of which may have been influential factors in his criminal conduct." The psychologist also opined that Dunlap's symptoms "*could* respond to mental health treatment," and, as the title of a heading, wrote: "5. The defendant agrees to comply with treatment as a condition of diversion."

Dunlap submitted a probation pre-conviction report with his motion. The report described Dunlap's January 12, 2023 robbery at a Macy's store in Santa Clarita. In that incident, a loss prevention officer saw Dunlap placing multiple boxes of fragrances and a Coach beanie into a black trash bag. When Dunlap left the store without paying, the officer confronted him and identified himself. Dunlap dropped the bag and began reaching inside, and a second loss prevention officer grabbed Dunlap's arm. Dunlap said he was going to grab his phone, so the officer let his arm go, and Dunlap began walking away from the officers while rummaging through the bag. A loss prevention

4

officer again tried to grab Dunlap's arm. Dunlap dropped the bag and swung his arm towards the officer, causing the officer's hat to fall. He began "pushing" the officer's face. A different loss prevention officer grabbed Dunlap's other arm. Dunlap struggled to get away and yelled, " 'Get em!' " Dunlap was yelling towards a vehicle with Florida license plates, which was parked at the front curb of the store. A loss prevention officer approached and photographed the car's license plate. The car sped away. The officers handcuffed Dunlap and recovered the black trash bag, which contained "numerous unpaid items valuing approximately $3,780." Dunlap told law enforcement he had planned to resell "the perfume" to obtain money to purchase a house.

Dunlap also included police reports from the Northridge Macy's incident and from a recent arrest at a Macy's in Pasadena. As detailed in one report, on March 14, 2023, Dunlap went to a Macy's in Northridge. Around 12:00 p.m., a loss prevention officer, Michael Yalogo Rubio, observed a man, later identified as Dunlap, and a woman, later identified as Dernesha Gregoire, in the store's perfume section. Rubio notified two other loss prevention officers. Dunlap and Gregoire left the perfume area without taking anything. They returned approximately 15 minutes later carrying large bags. The loss prevention officers watched as they put perfumes in the bags. When Dunlap and Gregoire walked out of the store without paying, Rubio identified himself as a loss prevention officer and said he needed to talk to them about the items in the bags. Dunlap replied, " 'Fuck you, let us go or I'm gonna pop you.' " Dunlap and Gregoire began to "assault" Rubio. The other two loss prevention officers pulled Dunlap off Rubio. While they were attempting to take Dunlap into custody, he "produced a black metallic object from his

5

pocket." The loss prevention officers "disengaged," fearing it was a weapon. Dunlap and Gregoire left the location with some of the merchandise.

A responding Los Angeles Police Department (LAPD) officer reviewed a security video of the incident. The video showed Dunlap and Gregoire returning to the store with empty bags, which they filled with perfumes. The video also showed Dunlap and Gregoire leaving the store, Rubio confronting them, and Dunlap and Gregoire "punching and scratching Rubio." The two other loss prevention officers "rushed to help." Dunlap then produced a "black object from his pocket," and the loss prevention officers disengaged. Dunlap and Gregoire left the store with some of the property they had already taken. Rubio saw Dunlap and Gregoire drive away in a vehicle with a Florida license plate.

LAPD officers observed "vandalized property at [the] scene that was destroyed while attempting to take the suspects into custody." Rubio told the LAPD officers that Dunlap struck the back of his head, but he did not have any visible injuries. The other two loss prevention officers had visible injuries.

Later the same day, Dunlap and Gregoire were arrested for robbery and mayhem at a Macy's in Pasadena. According to the police report, loss prevention officers saw Dunlap and Gregoire gathering boxes of fragrances in their arms. Gregoire also placed fragrances in two plastic bags. When a loss prevention officer approached them, they ran outside the store. Three officers circled Dunlap and told him to drop the items. He refused and pushed the officers with his elbows, trying to escape, and dropped the merchandise. Dunlap hit all three officers, approximately five times each, as they attempted to handcuff him. Meanwhile, Gregoire had run to an idling vehicle with a Florida license plate,

6

but she returned when she saw Dunlap struggling with the officers and began assaulting an officer. Both Dunlap and Gregoire bit one of the officers.

Pasadena police officers arrived. They arrested Dunlap and Gregoire on robbery (§ 211) and mayhem (§ 203) charges. Law enforcement recovered 35 packages of fragrances outside the store, totaling almost $4,500. During the struggle, all three officers sustained bite marks and other injuries. One also had a "slightly torn" and bleeding ear.

The Pasadena police report stated that Dunlap and Gregoire "work together in an organized theft ring." Both had outstanding warrants for prior thefts. The report further noted that Dunlap and Gregoire used the same car in the Northridge and Pasadena incidents, a rental car with Florida license plates.

In a written opposition to the motion, the prosecution argued Dunlap was a member of an "organized retail theft ring," the charged offenses were part of a "crime spree," and theft was Dunlap's "livelihood." The prosecution asserted that Dunlap's mental disorders were not a significant factor in the charged crimes. The opposition argued the crimes were "pre-planned, organized, and somewhat sophisticated," noting there were similar facts in the two charged incidents and cases pending in Pasadena and the Antelope Valley. However, the opposition did not offer any evidence about the Antelope Valley incident.[4] The

---

[4] As in other proceedings, in mental health diversion cases, "argument by counsel 'is not evidence in the case and cannot be relied upon to support the trial court's order.' [Citation.]" (*People v. Harlow* (2025) 113 Cal.App.5th 485, 491, 492 (*Harlow*) [prosecution offered no evidence about prior conduct so it could not rebut statutory presumption].)

prosecution further contended that Dunlap had actively attempted to avoid detection by engaging in three of the crimes far from the Antelope Valley, where Dunlap lived and already had a pending criminal case.

In June 2024, the trial court denied Dunlap's motion without prejudice. The court recognized that Dunlap's diagnosis created a presumption that his mental disorders were a significant contributing factor in the commission of the charged offenses, under section 1001.36, subdivision (b)(2). However, it found clear and convincing evidence rebutted the statutory presumption. The court concluded that the Santa Clarita, Northridge, and Pasadena robberies were specific, planned acts. The court reasoned that the incidents involved casing stores, targeting "large amounts of fragrances," the use of a bag as a "tool," and Dunlap's coordination with another person.[5] The court also stated that it was hard to "take a leap as to what the relationship is between the mental illness and the crime that was committed. Here, I think, because I have the description of three separate incidents, I feel that is clear and convincing evidence in this court's mind that reflects that presumption." The court thus found Dunlap ineligible for diversion.

On November 15, 2024, Dunlap, now representing himself, made an oral motion for reconsideration of his motion for

---

[5] There is evidence that Dunlap looked at the fragrance section of the Northridge store before returning with a bag. The probation report, which was the only source of evidence regarding the Santa Clarita robbery before the trial court when deciding the motion for diversion, does not provide any indication of casing at the Santa Clarita store. The police report regarding the Pasadena store incident also does not provide details suggestive of casing.

diversion.  On November 25, the trial court reheard and again denied Dunlap's motion.  The court stated that it had previously agreed to deny the motion without prejudice in the event there was new information about the "manner in which the crime was committed" that might change the outcome as to the nexus between Dunlap's mental health and the crimes.  Dunlap replied by informing the court of his participation in substance abuse treatment and other programs while in jail.  He also said that he had undergone a new psychological evaluation and would soon receive the results.  The court found that this did not change "the facts of the way this happened, and that was the basis [on] which the court denied the motion."

B.    **Applicable legal principles and standard of review**

Section 1001.36 provides in relevant part: "(b) A defendant is eligible for pretrial diversion pursuant to this section if both of the following criteria are met: [¶] (1) The defendant has been diagnosed with a mental disorder . . . [¶] (2) The defendant's mental disorder was a significant factor in the commission of the charged offense.  If the defendant has been diagnosed with a mental disorder, the court shall find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense."

To determine whether a defendant's mental disorder was a significant factor in the commission of the charged offense, "[a] court may consider any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health

9

treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense." (§ 1001.36, subd. (b)(2).)

If a defendant meets the eligibility requirements in subdivision (b), then the court must determine if the defendant is suitable for diversion as set forth in section 1001.36, subdivision (c). A defendant is suitable for diversion if four criteria are met: "(1) In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment"; "(2) The defendant consents to diversion and waives the defendant's right to a speedy trial"; "(3) The defendant agrees to comply with treatment as a condition of diversion"; and "(4) The defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(1)–(4).)

In addition, a trial court must also be "satisfied that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant." (§ 1001.36, subd. (f)(1)(A)(i).)

Finally, "even where defendants make a prima facie showing that they meet all the express statutory requirements, the court may still exercise its discretion to deny diversion. [Citations.] But this 'residual' discretion must be exercised ' "consistent with the principles and purpose of the governing law." ' [Citations.] That purpose includes a strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual

10

and the community." (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 892–893.)

"A trial court's ruling on a motion for mental health diversion is reviewed for an abuse of discretion, and factual findings are reviewed for substantial evidence." (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147.) "A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence [citation]." (*People v. Moine* (2021) 62 Cal.App.5th 440, 449.)

"[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996; accord, *Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 688.)

### C. Substantial evidence supported the trial court's finding that the statutory presumption was rebutted

We disagree with Dunlap's contention that the record lacked "substantial evidence from which a reasonable fact finder could have found it highly probable that petitioner's mental

11

disorder 'was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense.' (§ 1001.36, subd. (b)(2).)" (*Lacour v. Superior Court* (2025) 110 Cal.App.5th 391, 402 (*Lacour*).)

It is undisputed that Dunlap met the eligibility requirements in section 1001.36, subdivision (b)(1), relating to a diagnosis of a qualifying mental disorder. Regarding the second eligibility factor, Dunlap's psychologist concluded that his mental disorders "may have been influential factors in his criminal conduct," citing his "compromised" "capacity for impulse control," and his impaired judgment and decision-making abilities due to his use of substances. She further opined that Dunlap's substance use and mental disorders together would have caused "disorganized thinking, emotional instability, and erratic behavior . . . ."

The statutory presumption was thus triggered, requiring the trial court to find that Dunlap's mental disorders were a significant factor in the commission of the offenses. To overcome this presumption, the People were required to produce clear and convincing evidence that Dunlap's mental disorders were not a motivating, causal, or contributing factor in his commission of the offenses. The People produced such evidence in this case. Dunlap and at least one other person targeted three different Macy's stores, took a specific type of item, and used the same getaway car which had out-of-state license plates. Even though there was no evidence to indicate how much of the advance planning Dunlap personally did, his participation in multiple incidents using the same modus operandi could reasonably be interpreted as showing organized thinking, a lack of impulsivity, and control over his behavior.

12

This was sufficient to establish that it was highly likely Dunlap's mental disorders were not a factor in the crimes. (*Harlow*, *supra*, 113 Cal.App.5th at p. 491.) The facts of these sequential crimes directly refuted the evidence that Dunlap's mental disorders caused him to have disorganized thinking, emotional instability, or erratic behavior, which caused, motivated, or contributed to his involvement in the offenses. Instead, the trial court could reasonably view Dunlap's actions as methodical, organized, and highly rational conduct. This was clear and convincing evidence that permitted the trial court to conclude that Dunlap had engaged in a considered pattern of conduct with distinct financial aims.

This case is thus unlike *Lacour*, in which the trial court's ruling denying mental health diversion was based on the absence of evidence that the defendant's mental disorder was a factor in the commission of the offense. (*Lacour*, *supra*, 110 Cal.App.5th at p. 404.) The trial court here permissibly relied on the evidence delineating the probable manifestations of Dunlap's mental disorders on his behavior and evidence regarding the crimes, which was inconsistent with the description of how the mental disorders could be anticipated to affect Dunlap. The evidence that Dunlap went to different branches of a particular store on three separate occasions, targeted a specific high-value object, coordinated with another person in a getaway car with out-of-state license plates, and had a plan to resell the stolen items, rebutted the claim that impaired judgment, disorganized thinking, emotional instability, or erratic behavior played a role in Dunlap's commission of the crimes. The trial court could reasonably conclude it was highly probable Dunlap's mental disorders were not a motivating, causal, or contributing factor in

13

his commission of the charged offenses. The court did not abuse its discretion in denying the motion.

## II. Substantial Evidence Did Not Support a Theft Instruction on Counts 3 to 5

Dunlap also contends that the trial court erred in failing to instruct the jury on theft as a lesser included offense on counts 3 to 5, regarding the incident at the Northridge Macy's. We disagree.

### A. Background

The evidence at trial was largely consistent with the facts we have detailed above. At trial, Rubio testified that when Dunlap and Gregoire left the Northridge store without paying for the items they had put into bags, Rubio approached, identified himself, and said that he needed to speak with them about the merchandise they had. The loss prevention officers told Dunlap and Gregoire that they needed to return to "do paperwork in the office," but they "tried to get away," so the officers attempted to handcuff them. When Rubio brought Gregoire inside the store, she tried to run away and slapped and bit him. Security officer Austin Barry "brought [Dunlap] inside the store by reasonable force." Security officer Ronnie Ogassian was "kind of sitting back" while Barry "made contact with" Dunlap.

Barry tried to de-escalate the situation by telling Dunlap that they only needed to do paperwork. Barry eventually became "exhausted" trying to handcuff Dunlap and let him go. Dunlap pulled out an object without saying anything. Barry believed the object was a weapon, so he retreated. Barry then "realized it wasn't" a weapon, but by then, Dunlap had "charged" at Rubio, so Barry tried to pull him off. Barry testified that he thought the object was a pair of sunglasses.

14

Rubio had just handcuffed Gregoire's left wrist when Dunlap, now free, struck Rubio in the back of his head with his fist. Dunlap also used an eight-foot metal sign to hit Rubio in the back and on his head. Barry and Ogassian tried to pull Dunlap off Rubio. During the struggle, Dunlap punched Barry, Barry fell to the floor, and Dunlap kicked Barry as he tried to get up. While Dunlap hit Rubio with the metal sign, Rubio removed Gregoire's handcuffs and then told her and Dunlap to leave.

Rubio testified that, at that point, Dunlap pulled out a black object and said something like he was going to "cap us" or "pop you." Dunlap was "trying to get more physical," and he also threatened Barry and Ogassian with the sign.

Dunlap "grabbed" Gregoire and left, first picking up some of the perfumes.[6] Rubio told them not to take the unpaid-for items. Dunlap and Gregoire continued exchanging words with the security officers. Dunlap "made more threats," then walked off. Dunlap and Gregoire took over 10 packages of perfume. Rubio saw them leave in a car with Florida license plates.

Barry and Ogassian had marks and scrapes on their bodies. Rubio had bumps and bruises on the back of his head and back. Glass fixtures inside the store were broken. The incident was captured on surveillance video.

At trial, defense counsel requested a grand theft instruction as to counts 3 to 5. Counsel argued that during the Northridge incident, Dunlap used force not to obtain the stolen property but "in response to a physical assault by un uniformed [*sic*] individuals." The trial court denied the instruction, finding no

---

[6] Rubio testified that during the struggle, some of the unpaid-for merchandise was inside the store and some was outside. Barry testified that all of the merchandise was outside.

evidence that Dunlap was "simply trying to break away" from the loss prevention officers' use of force, such that Dunlap's use of force was independent from his taking of the property.

### B.    Applicable legal principles and standard of review

Theft is the felonious taking of another's personal property. (§ 484, subd. (a); see also § 487, subd. (a) [grand theft is taking property over $950].)  "Robbery is defined as 'the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.'  (Pen. Code, § 211.) . . . In California, '[t]he crime of robbery is a continuing offense that begins from the time of the original taking until the robber reaches a place of relative safety.'  [Citation.]  It thus is robbery when the property was peacefully acquired, but force or fear was used to carry it away." (*People v. Anderson* (2011) 51 Cal.4th 989, 994.)  The defendant's intent to take the property must occur before the use of force. (*Id.* at p. 995; *People v. Bradford* (1997) 14 Cal.4th 1005, 1055–1056.)  "Theft is a lesser and necessarily included offense in robbery . . . ."  (*People v. Ramkeesoon* (1985) 39 Cal.3d 346, 351.)

"[A] trial court must instruct the jury on a lesser included offense, whether or not the defendant so requests, whenever evidence that the defendant is guilty of only the lesser offense is substantial enough to merit consideration by the jury."  (*People v. Choyce* (2025) 18 Cal.5th 86, 104.)  "Substantial evidence in this context is that which a reasonable jury could find persuasive. [Citation.]  In deciding whether there exists sufficient evidence to support a requested instruction, trial courts should resolve all doubts in favor of the accused.  [Citation.]  However, speculation

is not evidence and will not warrant the giving of an instruction on a lesser included offense." (*Ibid.*)

" 'On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense.' [Citation.]" (*People v. Nelson* (2016) 1 Cal.5th 513, 538.) "[I]n doing so we view the evidence in the light most favorable to the defendant." (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

### C. Evidence of theft

Dunlap argues there was evidence suggesting he had abandoned any intent to steal when he used force. He relies on evidence that he was not holding the stolen merchandise during his use of force, and that he fought the loss prevention officers to free himself and Gregoire. We conclude this evidence was insufficient to warrant a theft instruction.

It is undisputed that Dunlap exited the store with items he had not purchased before the loss prevention officers stopped him. The officers forced him inside after he refused to return. As Barry struggled to handcuff Dunlap, Barry became exhausted and released him. Dunlap then used force on both Barry and Rubio. As Dunlap hit Rubio with the sign, Rubio released Gregoire. Rubio told them to leave, and Dunlap pulled out a black object, verbally threatened the officers, and also threatened all three officers with the sign. After Rubio again told them to leave but not to take the merchandise, Dunlap made some kind of threat and walked away after retrieving some of the stolen items.

The evidence established that Dunlap formed an intent to steal the property, left the store with it, then used force to remain in possession of it, even if also to free himself and Gregoire, only dropping it briefly as he used force. Dunlap argues he used force

17

to free Gregoire and responded to the officers' use of force.  The record supports this.  But there is no evidence that he acted *solely* in self-defense, or to free her, and not to effectuate the robbery.  We measure his intent over the course of the robbery.  A " '[d]efendant's guilt is not to be weighed at each step of the robbery as it unfolds.  The events constituting the crime of robbery, although they may extend over large distances and take some time to complete, are linked by a single-mindedness of purpose.  [Citation.]' "  (*Miller v. Superior Court* (2004) 115 Cal.App.4th 216, 223, quoting *People v. Estes* (1983) 147 Cal.App.3d 23, 28 (*Estes*); accord, *People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1059.)  Here, there was evidence that Dunlap intended to steal before his use of force and fear and still intended to do so afterwards.

Dunlap relies on *People v. Pham* (1993) 15 Cal.App.4th 61, 68 (*Pham*) for the proposition that "[i]f defendant truly abandoned the victims' property before using force, then, of course he could be guilty of theft, but not of an *Estes*-type robbery."  Dunlap appears to urge us to conclude that he abandoned his intent to steal simply because he dropped the stolen items.  However, "[t]here was nothing more than sheer speculation to support the scenario now advanced by [Dunlap] that the idea of taking [or re-taking Macy's] property did not arise until after" his use of force and threats to the security officers.  (*People v. Lewis* (1990) 50 Cal.3d 262, 277.)  There is no evidence that Dunlap, having initially left without paying for the goods, abandoned this intent during his use of force, only to regain it moments later.

That Dunlap did not retain continuous possession of the items does not, by itself, establish abandonment.  In *Pham*, John

18

Guevara discovered the defendant removing objects through the trunk of Guevara's car. (*Pham, supra,* 15 Cal.App.4th at p. 64.) As Guevara approached, the defendant fled with a bag of items. (*Ibid.*) Guevara caught the defendant by his shirt. (*Ibid.*) The defendant dropped the bag and punched Guevara several times. (*Ibid.*) Steve Oravec, who was with Guevara, caught up and grabbed the defendant. (*Ibid.*) The defendant continued to struggle, kicking, punching, biting, and kneeing Guevara and Oravec. (*Ibid.*) Guevara and Oravec eventually "subdued" the defendant until the police arrived. (*Ibid.*) Inside the bag, the police found items belonging to Guevara and Oravec that had been in Guevara's car. (*Ibid.*)

The defendant in *Pham* made an argument related to the one Dunlap asserts here. The defendant argued there was insufficient evidence he took property using force or fear, pointing to the "undisputed evidence showing that he [had] dropped the stolen goods just as [the victim] apprehended him and that he never touched the bag again." (*Pham, supra,* 15 Cal.App.4th at pp. 64–65.) The *Pham* court rejected this contention, observing that "[a] very slight movement is sufficient for asportation [citation], and there is no requirement that the robber have manual possession of the property." (*Id.* at p. 65.) The court reasoned that "the asportation or carrying away of the property occurred when defendant removed the victims' property from Guevara's car and began to flee. The asportation continued while defendant struggled with the victims and prevented them from immediately recovering their goods." (*Ibid.*)

Here, Dunlap's "possession and asportation of the victims' property began when [the] defendant started to walk away from [the store] with the loot and continued throughout the time [the]

defendant forcibly resisted the victims' attempts to take back their property." (*Pham*, *supra*, 15 Cal.App.4th at pp. 66–67.) There was no evidence from which the jury could reasonably conclude he abandoned the property and then only used force to escape, rather than concluding he used force to escape *with* the property. As in *Pham*, Dunlap's use of force was in an attempt to escape with the stolen items. "The use of force or fear to escape or otherwise retain even temporary possession of the property constitutes robbery." (*People v. Flynn* (2000) 77 Cal.App.4th 766, 772; see also *Estes*, *supra*, 147 Cal.App.3d at p. 27.) Further, it was undisputed that Dunlap made threatening statements as he was leaving the Macy's and immediately retrieved the items he had dropped.

Finally, Dunlap argues that the jury could have reasonably concluded there was no evidence that he used force against Ogassian. He appears to assert that a theft instruction was therefore warranted as to the count pertaining to Ogassian. We disagree. There is evidence that Dunlap threatened all three officers verbally and with a large metal sign. Ogassian was also visibly injured in the scuffle. Robbery occurs "whether a perpetrator relies on force *or fear* to gain possession or to maintain possession against a victim who encounters him for the first time as he carries away the loot." (*People v. Gomez* (2008) 43 Cal.4th 249, 265, italics added.) Even if Dunlap did not make physical contact with Ogassian, there was evidence that he used fear against all three officers to escape with the property.

The trial court properly denied Dunlap's requested theft instruction.

## DISPOSITION

The order and judgment are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EGERTON, Acting P. J.

HANASONO, J.